# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                  No. CR 12-3182 JB

GEORGE ROYBAL

       Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Sentencing Memorandum for Defendant George Roybal, filed April 14, 2015 (Doc. 846)("Objections").  The Court held sentencing hearings on May 27, 2015, June 1, 2015, and June 2, 2015.  The primary issues are: (i) whether the Court should apply a 2-level adjustment under United States Sentencing Guidelines ("USSG") § 2D1.1(b)(1) for possessing a dangerous weapon in connection with a drug-trafficking offense; (ii) whether the Court should impose a 2-level enhancement under § 2D1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance; (iii) whether the Court should impose a 2-level adjustment under § 3C1.1 for willfully obstructing or impeding the administration of justice; (iv) whether the Court should increase Defendant George Roybal's base offense from 24 to 26 for trafficking two kilograms of cocaine on April 10, 2012; (v) whether the Court should grant G. Roybal a mitigating role

---

[1]In its Sealed Memorandum Opinion, filed November 17, 2015 (Doc. 1069)("Sealed MO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MO before the Court published a public version of the Sealed MO. See Sealed MO at 1 n.1.  The Court gave the parties fourteen calendar days to provide notice of any proposed redactions.  See Sealed MO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MO in its unsealed form.

adjustment under § 3B1.2; and (vi) whether the Court should vary from the advisory guideline range in fashioning an appropriate sentence for G. Roybal under 18 U.S.C. § 3553(a).  The Court will not impose a 2-level enhancement under § 2D1.1(b)(1), because G. Roybal has demonstrated that it is clearly improbable that the guns discovered at his house were used in connection with drug-trafficking offenses by showing that he used those guns for hunting.  The Court will impose a 2-level enhancement under § 2D1.1(b)(12), because the United States has shown by a preponderance of the evidence that distributing illegal drugs was one of G. Roybal's primary uses for his residence.  The Court will impose a 2-level adjustment under § 3C1.1, because G. Roybal willfully instructed and impeded the administration of justice when he threatened a confidential informant and his or her family.  The Court will increase G. Roybal's base offense level from 24 to 26, because the United States has shown by a preponderance of the evidence that G. Roybal was involved in trafficking two kilograms of cocaine on April 10, 2012. The Court will not grant G. Roybal a mitigating role adjustment under § 3B1.2, because there is no evidence that he is less culpable than the average participant in the Christopher Roybal Drug-Trafficking Organization ("C. Roybal DTO").  Finally, the Court will not grant G. Roybal's request for a variance.

## FACTUAL BACKGROUND

The Court includes this general factual background section to provide context to the case and tell a coherent story.  The Court takes its facts entirely from: (i) the re-disclosed Presentence Report, filed April 8, 2015 ("PSR"); (ii) the Sealed Response to Defendant George Roybal's Sentencing Memorandum, filed April 28, 2015 (Doc. 872)("Response"); and (iii) the Indictment,

filed December 12, 2012 (Doc. 1)("Indictment").[2]   The Court will make findings of fact to

resolve facts that G. Roybal disputes in a second factual background section.

In June 2011, the Federal Bureau of Investigation ("FBI") initiated an investigation code

named Operation Rain Check into the C. Roybal DTO.  See PSR ¶ 13, at 9.  Operation Rain

Check involved numerous investigative techniques, including multiple controlled purchases of

kilogram-quantities of cocaine and marijuana using a confidential human source -- "CHS-1."[3]

Response at 2.  During the course of the controlled purchases, CHS-1 met with and received

drugs from G. Roybal and C. Roybal, who is G. Roybal's nephew.  See PSR ¶¶ 15, 24, 25, at 9,

13.  Operation Rain Check culminated in a nineteen-Defendant indictment that Plaintiff United

States of America filed on December 12, 2012.  See Indictment at 1.  The FBI's investigation

into the Roybal DTO revealed that G. Roybal of Albuquerque, New Mexico -- was an associate

of the Roybal DTO.  See PSR ¶ 18, at 10.  "G. Roybal resided at 605 Parkside SE which agents

believed was used as a stash house for the Roybal DTO."  PSR ¶ 18, at 10.  According to the

case agent, G. Roybal was very involved in the C. Roybal DTO because he stored money and

drugs at his residence for C. Roybal.  See PSR ¶ 23, at 13.  "G. Roybal was identified in the

conspiracy early on in the investigation and he was involved in two drug transactions with the

CHS-1."  PSR ¶ 23, at 13.

The first drug transaction in which G. Roybal was involved occurred on April 5, 2012.

See PSR ¶ 24, at 13.  This transaction involved G. Roybal meeting with CHS-1 and providing

---

[2]The Court includes facts from the Response and the Indictment that are not set forth in
the PSR solely to provide context to how G. Roybal's charges arose and how they relate to the
United States' investigation into co-Defendant Christopher Roybal's drug-trafficking
organization.  G. Roybal does not dispute these facts, and, in any event, the Court does not rely
on these facts in its Analysis.

[3]The Court is not aware of the name or identity of CHS-1 and will therefore refer to him
or her as CHS-1 throughout this MOO.

approximately 1.7 pounds of marijuana.  See PSR ¶¶ 15, 24, at 10, 13.  The next day, on April 5, 2012, CHS-1 met with C. Roybal at a predetermined location to pay $5,540.00 for the marijuana that G. Roybal provided on the previous day.  See PSR ¶ 24, at 13.  Laboratory reports confirm that the net weight of the marijuana is 622.8 grams.  See PSR ¶ 24, at 13.

The second transaction in which G. Roybal was involved took place on April 10, 2012, when CHS-1 was scheduled to meet C. Roybal to purchase one kilogram of cocaine.  See PSR ¶¶ 15, 25, at 9, 13.  At the meeting location, G. Roybal arrived in a black Chevy Monte Carlo and instructed the CHS-1 to contact C. Roybal by telephone, and to tell him only time and location to meet, and not to discuss the pending transaction.  See PSR ¶ 25, at 13.  "The CHS subsequently met with C. Roybal at the predetermined location where the CHS paid Roybal $27,000 for approximately 1 kilogram of cocaine."  PSR ¶ 25, at 13.  Laboratory reports confirm that the net weight of the cocaine is 998.5 grams.  See PSR ¶ 25, at 13.

On that same day, G. Roybal delivered one kilogram of cocaine to "the CHS at the residence of the CHS[4]."  PSR ¶ 26, at 13.  "G. Roybal, who arrived in a black car, walked up to the car and got in the passenger seat and gave the CHS the cocaine."  PSR ¶ 26, at 13.

> G. Roybal complained his radar detector was not plugged in, so it was not working and he got pulled over by law enforcement on his way over.  The CHS took the cocaine into the residence and when the CHS returned the CHS paid G. Roybal $13,000.  They counted the money before G. Roybal left.  This same CHS provided information that he had been to G. Roybal's residence located at 605 Parkside SE in 2011 and 2012.  He described one occasion in 2011, where he

---

[4]It seems that the PSR identifies CHS-1 as the individual that G. Roybal delivered one kilogram of cocaine to on the evening of April 10, 2012.  See PSR ¶¶ 23-26, at 13.  At the hearing, in the parties briefing, and in several of the FBI debriefings, however, the parties refer to the individual involved in this cocaine transaction as John Doe 1.  The Court does not know the name or identity of John Doe 1, who is a co-defendant in this case and agreed to cooperate with the United States after his arrest.  Moreover, as this MOO's factual findings section reflects, the Court finds by a preponderance of the evidence that it was John Doe 1 who was involved in the cocaine transaction with G. Roybal on April 10, 2012 in Las Vegas, New Mexico.  See infra ¶¶ 39-48, 16-19.

observed a large trash bag with overflowing with [sic] one pound packages of marijuana and a backpack with cocaine.

PSR ¶ 26, at 13.

The next day, on April 11, 2012, "a call was intercepted over Roybal Phone 9 between C. Roybal and [Kurt] Gagarin[5]."  PSR ¶ 27, at 13.  Gagarin informed C. Roybal that he was sending someone to Albuquerque.  See PSR ¶ 27, at 13.  "Agents believed Gagarin was sending someone to Albuquerque to collect money from C. Roybal for high grade marijuana previously provided to C. Roybal."  PSR ¶ 27, at 13.  Over the next couple of hours numerous calls were intercepted between C. Roybal and several co-conspirators including CHS-1 and Co-Defendant Jairus Granado.  See PSR ¶ 27, at 13.  During most of the calls, C. Roybal was attempting to collect money to send back with co-Defendant Chase Cameron[6] to San Diego, California to give to Gagarin.  See PSR ¶ 27, at 13.  "Agents also intercepted two calls to Southwest Airlines reserving two seats to Las Vegas, Nevada for April 11, 2012."  PSR ¶ 26, at 13.  The reservations were made in the name of G. Roybal and C. Roybal, and C. Roybal reserved them using "buddy passes."  PSR ¶ 27, at 13.

On that same day, agents initiated surveillance at the Albuquerque Sunport, and, at 2:51 p.m. agents observed C. Roybal pick up a male later identified as Cameron.  See PSR ¶ 28, at 14.  After stopping at several locations, they arrived at G. Roybal's residence, 605 Parkside Drive SE in Albuquerque.  See PSR ¶ 28, at 14.  "[Cesar] Ramirez and G. Roybal were also at the

_____

[5]Kurt Gagarin was a large scale marijuana distributor in California and is a co-defendant who agreed to cooperate with the United States post-arrest.  The United States refers to Gagarin as John Doe 2 throughout its exhibits and pleadings.  The Court will, however, will refer to him as Gagarin, except where quoting directly from a source that refers to Gagarin as John Doe 2.

[6]Chase Cameron is a co-defendant who agreed to cooperate with the United States post-arrest.  The United States refers to Cameron as John Doe 3 throughout its exhibits and pleadings.  The Court will, however, will refer to him as Cameron, except where quoting directly from a source that refers to Cameron as John Doe 3.

residence." PSR ¶ 27, at 13.  They spent some time barbequing before C. Roybal retrieved a large amount of cash from one of the back rooms.  See PSR ¶ 28, at 14.  "The money was divided between Cameron, C. Roybal and G. Roybal as they drove back to the airport in order to get past security without being questioned regarding the origin of the money."  PSR ¶ 27, at 13. Agents observed Cameron meet with C. Roybal and G. Roybal near the gate where Cameron was waiting to board his flight.  See PSR ¶ 28, at 14.  The three of them then entered the restroom where surveillance was terminated.  See PSR ¶ 28, at 14.  "Agents next observed G. Roybal and C. Roybal exit the airport without ever boarding a flight."  PSR ¶ 27, at 13.  It was determined that C. Roybal provided Cameron with $31,500.00 in cash as partial payment toward a $50,000.00 drug debt for high-grade marijuana.  See PSR ¶ 28, at 14.

On December 14, 2012, agents executed a search warrant at G. Roybal's residence, located at 605 Parkside Drive SE.  See PSR ¶ 28, at 13.  Agents did not find any money or drugs at the residence, but they located the following items:

| Item | Location |
|---|---|
| Five cellphones | Master bedroom |
| 1 cellphone | Guest bedroom |
| A digital scale | Kitchen above microwave |
| Savage Rifle Model 64 22LR | Den/Dining room – next to front door |
| New England shotgun Padner Model SB1 20 gauge | Master bedroom under bed |
| Remmington 700 rifle w/scope 308 | Master bedroom under bed |
| Remmington 7400 rifle w/scope 243 & magazine | Master bedroom under bed |
| Weatherby Ninety Two shotgun 12 gauge | Master bedroom closet |

PSR ¶ 29, at 14.  On the day his residence was searched, G. Roybal was arrested, and he did not provide any post-arrest statements.  See PSR ¶ 30, at 14.  "G. Roybal's residence was identified as a stash house for drugs and money and there were five firearms found inside the home."  PSR ¶ 30, at 14.  One of the five firearms was found in the southeast corner of the den/dining room, and it was wrapped; however, "there were three firearms located under his bed in his bedroom which were accessible and unsecured."  PSR ¶ 30, at 14.  They also found a digital scale in the kitchen.  See PSR ¶ 30, at 14.  "The agent confirmed that none of firearms were [sic] stolen."  PSR ¶ 30, at 14.

> G. Roybal will be held accountable for the three drug transactions wherein he was involved in distributing marijuana and cocaine.  The total amount of drugs after the two substances have been converted to their marijuana equivalency totals 400.32 kilograms.  The monies which were provided to C. Cameron for marijuana totaled $31,500 which if converted to the marijuana equivalency based on the price of $1,800 per pound would total 17.5 pounds of marijuana.  This results in a total of 408.26 kilograms of marijuana which does not impact the base offense level, however, it will be attributed to the defendant.

PSR ¶ 31, at 14.

On February 12, 2013, G. Roybal was released on conditions of supervision pending resolution of the charges against him.  See PSR ¶ 32, at 15.  Subsequently, on November 13, 2013, G. Roybal approached an confidential human source -- "CHS-2"[7] -- at CHS-2's workplace.  See PSR ¶ 32, at 15.  G. Roybal informed CHS-2 that G. Roybal knew CHS-1 was related to CHS-2.  See PSR ¶ 32, at 15.  "G. Roybal went on to tell CHS-2 that he knew about CHS-1's medical condition and he was going to end up in a wheel chair for what CHS-1 had done."  PSR ¶ 32, at 15.  G. Roybal stated that he and his people had been watching CHS-1's residence, and that they knew when the children came home.  See PSR ¶ 32, at 14.  "G. Roybal added he and

_____

[7]The Court does not know the name or identity of CHS-2 and will therefore refer to him or her as CHS-2 throughout this MOO.

his people were going to hit CHS-1 where it hurts most and make CHS-1's family pay."  PSR ¶ 32, at 15.  G. Roybal further stated that, if CHS-1 went to Las Vegas, New Mexico, CHS-1 and his family would be in grave danger.  See PSR ¶ 32, at 15.  "CHS-2 told G. Roybal that CHS-1 babysits CHS-2's child on a regular basis and that CHS-2 did not want the child to be hurt."  PSR ¶ 32, at 15.  G. Roybal told CHS-2: "[o]h well, you know how it is."  PSR ¶ 32, at 15.

CHS-1 contacted the FBI, and informed it of the threat that G. Roybal had made against CHS-1 and CHS-1's family.  See PSR ¶ 33, at 15.  Agents verified the information with CHS-2 "who stated he/she was hesitant to continue to be cooperative with law enforcement as CHS-2 was in fear that G. Roybal would retaliate against CHS-1 and/or CHS-2 or CHS-2's family."  PSR ¶ 33, at 15.  It was determined that this threat to CHS-1 and to CHS-1's family had the purpose of influencing, delaying, and preventing CHS-1's testimony in an official proceeding.  See PSR ¶ 33, at 15.  A warrant was issued for C. Roybal, and he surrendered on the outstanding warrant.  See PSR ¶ 33, at 15.

## THE COURT'S FINDINGS OF FACT BASED ON THE MAY 27, 2015, JUNE 1, 2015, AND JUNE 2, 2015, EVIDENTIARY SENTENCING HEARINGS

Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure states that courts "must -- for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  The findings of fact in MOO shall serve as the Court's essential findings for purposes of rule 32(i)(3)(B).  In making these findings, the rules of evidence do not bind the Court.  See Fed. R. Evid. 1101(d)(3); United States v. Graham, 413 F.3d 1211, 1221 n.10 (10th Cir. 2005)("In any event, the Federal Rules of Evidence are not applicable to sentencing proceedings.")(citing Fed.

R. Evid. 1101(d)(3)).  The Court makes the following factual findings by a preponderance of the evidence:

1.      In the summer of 2011, the FBI began its investigation, code named Operation Rain Check, into primary target C. Roybal as head of the C. Roybal DTO, using surveillance, GPS tracking, wiretaps, roving wiretaps, trash pulls, and other investigative techniques.  See PSR ¶ 13, at 9; Response at 2.

2.      Soon after beginning its investigation, the FBI identified G. Roybal -- C. Roybal's uncle -- as a person of interest in the Roybal DTO.  See PSR ¶ 18, at 10; id. ¶ 23, at 13.

3.      Granado was a cocaine and marijuana distributor who sold drugs for C. Roybal. See Transcript of Hearing 32:2-7 (Long, Nelson)(taken May 27, 2015)("May 27th Tr.").[8]

4.      On March 15, 2012, C. Roybal provided drugs to Granado and Granado paid C. Roybal for drugs that C. Roybal had previously provided to him.  See May 27th Tr. at 32:11-37:9 (Long, Nelson); Transcript of Telephone Call between Jairus Granado and Christopher Roybal (recorded March 14, 2012), filed April 28, 2015 (Doc. 872-1)(admitted at the hearing as Government Exhibit 1); Transcript of Telephone Call between Jairus Granado and Christopher Roybal (recorded March 15, 2012), filed April 28, 2015 (Doc. 872-2)(admitted at the hearing as Government Exhibit 2); Transcript of Telephone Call between Jairus Granado and Christopher Roybal (recorded March 16, 2012), filed April 28, 2015 (Doc. 872-5)(admitted at the hearing as Government Exhibit 5)("March 16th Telephone Call").

5.      On March 16, 2012, Granado and C. Roybal spoke on the telephone about meeting up so that Granado could provide C. Roybal with money for the new drugs that C.

---

[8]The Court's citations to the May 27th Tr. refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

Roybal had provided to Granado on March 15, 2012.  See May 27th Tr. at 36:15-38:24 (Long, Nelson); March 16th Telephone Call.

6.      Because C. Roybal was unavailable to meet with Granado, C. Roybal directed Granado to meet with G. Roybal at his residence, located at 605 Parkside Place SE.  See May 27th Tr. at 36:15-38:24 (Long, Nelson); March 16th Telephone Call.

7.      During the March 16, 2012, telephone call between Granado and C. Roybal, C. Roybal provided Granado with G. Roybal's telephone number so that Granado and G. Roybal could be in direct contact.  See May 27th Tr. at 36:15-38:24 (Long, Nelson); March 16th Telephone Call.

8.      Granado knew where G. Roybal's residence was located and had been there before.  See May 27th Tr. at 36:15-38:24 (Long, Nelson); March 16th Telephone Call.

9.      On March 16, 2012, Granado dropped off money at G. Roybal's residence, located at 605 Parkside Place SE, that he owed C. Roybal for a prior illegal drug transaction.[9]

---

[9]In his Sentencing Memorandum, his Reply, and at the hearing, G. Roybal asserted that there is no evidence that: (i) he was home when Granado showed up at 605 Parkside Place SE on March 16, 2012; (ii) that Granado even entered the house; or (iii) that G. Roybal completed any money transaction with Granado on March 16, 2012.  The Court is not persuaded by G. Roybal's argument.   The March 16th Telephone Call establishes: (i) that because C. Roybal was unavailable, he directed Granado to meet up with G. Roybal on March 16, 2012, at his residence, to drop off funds that Granado owed for drugs that C. Roybal had previously provided; (ii) that C. Roybal gave Granado G. Roybal's telephone number so that they could be in direct contact; and (iii) that G. Roybal and Granado knew each other, that Granado knew where G. Roybal's residence was located and had been there before.  See March 16th Telephone Call.  Further, the March 16, 2012 FBI Surveillance Log, combined with Agent Nelson's testimony at the hearing, proves that Granado subsequently arrived at G. Roybal's residence, where he remained for approximately 10 minutes.  See March 16, 2012 FBI Surveillance Log at 1-2; May 27th Tr. at 38:25-40:22 (Long, Nelson).  The Court finds by a preponderance of the evidence that the available evidence establishes that on March 16, 2012, Granado dropped off money at G. Roybal's residence, located at 605 Parkside Place SE, that he owed C. Roybal for a prior illegal drug transaction.  This factual finding overrules G. Roybal's objection to the PSR's statement that G. Roybal was involved in the DTO as "he stored money and drugs" at his residence.  See Objections at 2.

See May 27th Tr. at 36:15-38:24 (Long, Nelson); March 16th Telephone Call; Excerpt of Search Warrant Affidavit ¶ 79, at 47-49, filed April 28, 2015 (Doc. 872-7)(admitted at the hearing as Government Exhibit 7); March 16, 2012 FBI Surveillance Log (dated March 16, 2012), filed April 28, 2015 (Doc. 872-4)(admitted at the hearing as Government Exhibit 4)("March 16, 2012 FBI Surveillance Log").

10.     Gagarin was a large scale marijuana distributor in California.  See May 27th Tr. at 41:6-23 (Long, Nelson).

11.     On March 19, 2012, C. Roybal and Gagarin spoke on the telephone and Gagarin attempted to collect money from C. Roybal for marijuana that Gagarin had previously supplied to C. Roybal.  See May 27th Tr. at 41:24-32:17 (Long, Nelson); Transcript of Telephone Call between John Doe 2 and Christopher Roybal (recorded March 19, 2012), filed April 28, 2015 (Doc. 872-25)(admitted at hearing as Government Exhibit 25)("March 19th Telephone Call").

12.     In the March 19, 2012, telephone call, Gagarin and C. Roybal discussed how C. Roybal could most easily get the funds to California.  See May 27th Tr. at 41:24-43:23 (Long, Nelson); March 19th Telephone Call.

13.     During the call, Gagarin and C. Roybal also discussed the possibility of C. Roybal going out of town, and C. Roybal reassured Gagarin that if he were to leave, his uncle would take care of everything.  See May 27th Tr. at 41:24-43:23 (Long, Nelson); March 19th Telephone Call.

---

Even if one were to doubt, however, whether Granado indeed entered G. Roybal's residence or whether the transaction was completed, the totality of the evidence surrounding the events of March 16, 2012, establishes that: (i) when C. Roybal was preoccupied, he used G. Roybal as his counterpart to complete drug related transactions; (ii) that Granado went to G. Roybal's residence on March 16, 2012 to complete a drug related transaction; and (iii) that Granado had been to G. Roybal's residence on previous occasions.  In sum, the totality of the evidence establishes that the C. Roybal DTO used 605 Parkside Place SE as a premises for drug transactions.

14.    On March 20, 2012, C. Roybal and Gagarin spoke on the telephone again, and C. Roybal explained to Gagarin that G. Roybal was in possession of the outstanding debts from people who sold drugs for the C. Roybal DTO.  See May 27th Tr. at 43:23-47:22 (Long, Nelson); Transcript of Telephone Call between John Doe 2 and Christopher Roybal (recorded March 20, 2012), filed April 28, 2015 (Doc. 872-26)(admitted at hearing as Government Exhibit 26)("March 20th Telephone Call").

15.    C. Roybal reassured Gagarin that his uncle would take care of everything.  See May 27th Tr. at 43:23-47:22 (Long, Nelson); March 20th Telephone Call.

16.    G. Roybal and Gagarin knew each other.  See May 27th Tr. at 43:23-47:22 (Long, Nelson); March 20th Telephone Call; Transcript of Telephone Call between John Doe 2 and Christopher Roybal (recorded April 9, 2012), filed April 28, 2015 (Doc. 872-21)(admitted at hearing as Government Exhibit 21).

17.    In an April 9, 2012, telephone call between C. Roybal and Gagarin, Gagarin asked whether someone might come out to California, and C. Roybal responded that his uncle was feeling better, and that maybe he would send him as a courier to California with money for Gagarin.  See May 27th Tr. at 50:13-52:2 (Long, Nelson); Transcript of Telephone Call between John Doe 2 and Christopher Roybal (recorded April 9, 2012), filed April 28, 2015 (Doc. 872-21)(admitted at hearing as Government Exhibit 21).

18.    C. Roybal and Gagarin, however, ultimately decided that Gagarin would instead send someone to New Mexico from California to collect the money.  See May 27th Tr. at 52:1-55:5 (Long, Nelson); Summary of Events at 4, filed April 28, 2015 (Doc. 872-10)(admitted at hearing as Government Exhibit 10)("Summary of Events"); Transcript of Telephone Call

between John Doe 2 and Christopher Roybal (recorded April 15, 2012), filed April 28, 2015 (Doc. 872-24)(admitted at hearing as Government Exhibit 24).

19.     Gagarin ultimately sent Cameron to New Mexico.  See May 27th Tr. at 55:1-18 (Long, Nelson); FBI Debrief with John Doe 3 at 1 (dated February 27, 2015), filed April 28, 2015 (Doc. 872-23)("FBI Debrief with John Doe 3")(admitted at hearing as Government Exhibit 23).

20.     On April 11, 2012, C. Roybal picked up Cameron at the Albuquerque Sunport. See May 27th Tr. at 55:1-18 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

21.     After picking up Cameron, C. Roybal and Cameron traveled around Albuquerque for a short time.  See May 27th Tr. at 55:1-18 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

22.     At approximately 2:59 p.m., C. Roybal and G. Roybal spoke on the telephone, and C. Roybal asked G. Roybal if he was going to be available around 4:00 p.m.  See May 27th Tr. at 55:25-56:7 (Long, Nelson); Transcript of Telephone Call between George Roybal and Christopher Roybal (recorded April 11, 2012), filed April 28, 2015 (Doc. 872-22)(admitted at hearing as Government Exhibit 22).

23.     G. Roybal stated that he would be available, and, subsequently, at 3:51 p.m., C. Roybal and Cameron arrived at G. Roybal's residence, located at 605 Parkside SE.  See May 27th Tr. at 55:25-56:25 (Court, Long, Nelson); Transcript of Telephone Call between George Roybal and Christopher Roybal (recorded April 11, 2012), filed April 28, 2015 (Doc. 872-22)(admitted at hearing as Government Exhibit 22); FBI Debrief with John Doe 3 at 1.

24.     C. Roybal and Cameron remained inside of G. Roybal's residence, located at 605 Parkside, for approximately thirty minutes.  See May 27th Tr. at 55:8-25 (Court, Long, Nelson); FBI Debrief with John Doe 3 at 1.

25.     Inside the residence, C. Ramirez, G. Roybal, and C. Roybal were barbequing.  See May 27th Tr. at 55:1-63:15 (Court, Long, Nelson); FBI Debrief with John Doe 3 at 1.

26.     At one point while they were barbequing, G. Roybal and C. Roybal went to a back bedroom and started stacking $31,500.00 in cash into piles, which they distributed to C. Roybal, G. Roybal, and Cameron.[10]  See May 27th Tr. at 62:14-64-12 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

27.     This money was being given to Cameron as partial payment toward a $50,000.00 debt he owed Gagarin for high-grade marijuana.  See May 27th Tr. at 58:16-60:25 (Long, Nelson).

28.     At 4:20 p.m., C. Roybal, G. Roybal, and Cameron left G. Roybal's residence together, got into C. Roybal's vehicle, and traveled to the Albuquerque Sunport.  See May 27th Tr. at 56:8-22 (Long, Nelson); id. at 62:14-64-2 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

29.     While traveling to the airport, they were on the phone making reservations through an airline.  See May 27th Tr. at 62:8-10 (Long, Nelson).

---

[10]G. Roybal disputes this fact, contending that he did not receive any money from anyone and that they did not discuss taking any money onto the airlines.  See Transcript of Hearing at 43:13-45:23 (G. Roybal)(taken June 1, 2015)("June 1st Tr.");  Objections at 2.  The Court does not believe G. Roybal's version of what took place at his residence on April 11, 2012, and concludes by a preponderance of the evidence that while they were barbequing, G. Roybal and C. Roybal went to a back bedroom and started stacking $31,500.00 in cash into piles, which they distributed to C. Roybal, G. Roybal, and Cameron.  Although the Court agrees that Cameron's credibility has not been tested directly in court, there is sufficient corroboration for the statements here.  The United States presented surveillance footage and agent surveillance that corroborate Cameron's description of the transaction that day.  See FBI Debrief with John Doe 3 at 1.  Moreover, this factual finding overrules G. Roybal's objection to the PSR's statement that G. Roybal was involved in the DTO as "he stored money and drugs" at his residence.  See Objections at 2.  It also overrules G. Roybal's objection that: "[he] was unaware of the money transactions identified in this paragraph. . . . Mr. George Roybal did not have any money."  See Objections at 2.

30.     When they arrived at the airport, C. Roybal needed to park the car, so Cameron and G. Roybal went through security together.  See May 27th Tr. at 56:23-58:7 (Long, Nelson); id. at 60:4-64-2 (Long, Nelson).

31.     C. Roybal later went through airport security alone after parking his vehicle.  See May 27th Tr. at 56:23-58:7 (Long, Nelson); id. at 60:4-64:2 (Long, Nelson).

32.     Once inside the airport, Cameron, G. Roybal, and C. Roybal met in the bathroom in order to re-pool the money together for Cameron to take back to California with him.[11]  See May 27th Tr. at 56:23-58:7 (Long, Nelson); id. at 60:4-64:2 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

33.     G. Roybal and C. Roybal took turns going into the stall next to Cameron and handing the funds they had organized at G. Roybal's residence underneath the stall to Cameron

---

[11]G. Roybal disputes this fact, contending that he did not receive any money from anyone and that they did not discuss taking any money onto the airlines.  See June 1st Tr. at 43:13-45:23 (G. Roybal); Objections at 2.  He contends that he and C. Roybal decided to go on a vacation to San Diego and that he packed his bags.  See June 1st Tr. at 43:13-45:23 (G. Roybal).  He states that he did not have any money with him, that he did not conceal any money for anyone, and that he used only his credit cards.  See June 1st Tr. at 43:13-47:7 (G. Roybal).  G. Roybal maintains that the reason he did not get on the plane is that by the time C. Roybal got past the security line, the plane had already left; they missed their flight.  See June 1st Tr. at 46:9-47:10 (G. Roybal).  G. Roybal asserts that he did not get on the next flight because he: "was studying for my boards test I was taking them that same week I decided I'll just study for the boards which was more important than going upon a mini vacation."  See June 1st Tr. at 46:21-25.

The Court does not believe G. Roybal's version of the events of April 11, 2012, and concludes by a preponderance of the evidence that once past the security line at the airport, Cameron, G. Roybal, and C. Roybal met in the bathroom in order to re-pool the $31,500.00 together for Cameron to transport back to California with him.  Although the Court agrees that Cameron's credibility has not been tested directly in court, there is sufficient corroboration for the statements here.  The United States presented surveillance footage and agent surveillance that corroborate Cameron's description of the transaction that day.  See FBI Debrief with John Doe 3 at 1.  This factual finding overrules G. Roybal's objection that: "[he] was unaware of the money transactions identified in this paragraph. . . . Mr. George Roybal did not have any money."  See Objections at 2.

to transport to California.[12]  See May 27th Tr. at 56:23-58:7 (Long, Nelson); id. at 60:4-64-2 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

34.     During this time, Gagarin, the marijuana supplier in California, also spoke on the telephone to C. Roybal.  See May 27th Tr. at 58:8-11 (Long, Nelson).

35.     Gagarin and C. Roybal discussed how much C. Roybal would be sending with Cameron to California.  See May 27th Tr. at 58:12-21 (Long, Nelson).

36.     C. Roybal owed $50,000.00 and he agreed to send $36,000.00 to Gagarin.  See May 27th Tr. at 58:16-21 (Long, Nelson).

37.     Cameron ultimately transported $31,500.00 to Gagarin in California.  See May 27th Tr. at 55:1-18 (Long, Nelson); May 27th Tr. at 60:4-25 (Long, Nelson); FBI Debrief with John Doe 3 at 1.

38.     Before the April 11, 2012, events involving Cameron's visit from California to Albuquerque on behalf of Gagarin, G. Roybal was involved in two one-kilogram cocaine transactions on April 10, 2012.  See May 27th Tr. at 64:15-76:25 (Long, Nelson).

39.     The first cocaine transaction on April 10, 2012, involved co-Defendant John Doe 1,[13] who agreed to cooperate with the United States post-arrest.  See May 27th Tr. at 64:15-65:1 (Long, Nelson).

_____

[12]The Court incorporates its legal analysis from footnotes 10 and 11 and concludes by a preponderance of the evidence that G. Roybal and C. Roybal took turns going into the stall next to Cameron and handing the funds they had organized at G. Roybal's residence underneath the stall to Cameron to transport to California.  This factual finding overrules G. Roybal's objection that: "[he] was unaware of the money transactions identified in this paragraph. . . . Mr. George Roybal did not have any money."  See Objections at 2.

[13]The Court does not know the name or identity of John Doe 1 and will therefore refer to him or her throughout this MOO as John Doe 1.

40.     John Doe 1 lived in Las Vegas, New Mexico.  See May 27th Tr. at 65:2-4 (Long, Nelson).

41.     C. Roybal would provide marijuana and cocaine to John Doe 1, who would sell it. See May 27th Tr. at 65:8-18 (Long, Nelson).

42.     John Doe 1 would convert the cocaine into crack before selling it.  See May 27th Tr. at 65:15-18 (Long, Nelson).

43.     On April 9, 2012, John Doe 1 complained to C. Roybal about the quality of the cocaine that C. Roybal had supplied to him previously, C. Roybal indicated that he had another supply that he would like to provide to John Doe 1, and they discussed the possibility of a price reduction.  See May 27th Tr. at 65:19-67:3 (Long, Nelson); FBI Debrief with John Doe 1 at 1-2 (dated March 26, 2015), filed April 28, 2015 (Doc. 872-13)("FBI Debrief with John Doe 1")(admitted at hearing as Government Exhibit 13).

44.     On April 10, 2012, C. Roybal tells John Doe 1 that he would be able to deliver one kilogram of cocaine to him that day.  See May 27th Tr. at 67:4-14 (Long, Nelson); Summary of Events at 3.

45.     On the evening of April 10, 2012, G. Roybal traveled from Albuquerque to Las Vegas and provided John Doe 1 with one kilogram of cocaine at approximately 10:45 p.m., and John Doe 1 provided $13,000.00 to G. Roybal for the kilo of cocaine, as half payment.[14]  See

_____

[14]G. Roybal asserts that he did not travel to Las Vegas, New Mexico to deliver a kilogram of cocaine to John Doe 1.  See June 1st Tr. 93:23-94:4 (Long, G. Roybal).  The Court is not persuaded and concludes by a preponderance of the evidence that on the evening of April 10, 2012, G. Roybal traveled from Albuquerque to Las Vegas and provided John Doe 1 with one kilogram of cocaine at approximately 10:45 p.m., and John Doe 1 provided $13,000.00 to G. Roybal for the kilo of cocaine, as half payment.

The FBI debrief with John Doe 1 states the following:

May 27th Tr. at 69:4-77:15 (Long, Nelson); id. at 156:16-24 (Long, Nelson); FBI Debrief with

John Doe 1 at 2; Text Message from George Roybal to Christopher Roybal (dated April 10,

2012, 8:39 p.m.), filed April 28, 2015 (Doc. 872-14)("April 10th Text Message")(admitted at the

hearing as Government Exhibit 14); Transcript of Telephone Call between John Doe 1 and

---

CHS provided the following details regarding the sale of a kilogram of cocaine on April 10, 2012: GEORGE ROYBAL arrived at the residence of the CHS, in a black car, possible a Monte Carlo.  CHS walked up to the car and got into the passenger seat.  GEORGE ROYBAL gave CHS a kilogram of cocaine.  GEORGE ROYBAL complained to CHS that his radar detector was not plugged in, so it was not working and he was pulled over on his way up.  CHS took the cocaine into its residence and came back out.  CHS provided $13,000 to GEORGE ROYBAL.  They counted the money and GEORGE ROYBAL took possession of the money.  GEORGE ROYBAL then left.

FBI Debrief with John Doe 1 at 2 (emphasis in original).  John Doe 1's credibility, of course, has not been tested in Court.  The United States has, however, explained why there is good cause for nondisclosure of the informant's identity.

Moreover, the Court concludes that intercepted wire communications have sufficiently corroborated John Doe's statements.  First, the United States has offered evidence that G. Roybal sent the following text message to C. Roybal on April 10, 2012 at 8:39 p.m.: "Hey carbon you fucked me my radar detector didn't go off cause you unplugged it and didn't plug it back in." April 10th Text Message at 1.  Second, the United States has offered evidence of an intercepted wire communication between C. Roybal and John Doe 1 that took place on April 10, 2012 at 9:59 p.m.  See April 10th Telephone Call, 9:59 p.m.  John Doe 1 tells C. Roybal that "your uncle just called me and he'll be at my pad in like a half an hour."  Finally, the United States has offered evidence of an intercepted wire communication between C. Roybal and John Doe 1 on April 10, 2012 at 10:52 p.m.  See Summary of Events at 4.  In that phone call, John Doe 1 tells C. Roybal that "we were checking it out now" and that they used a "condom."  See Summary of Events at 4.  John Doe 1 has explained that a condom is indicative of good quality (original packaging that has not been cut previously).  See Summary of Events at 4.  C. Roybal also tells John Doe 1 to "tell him I got his text message," and then someone in the background says, "motherfucker."  See Summary of Events at 4.  Further, at the hearing, agent Nelson testified that he was able to identify the voice saying "motherfucker" as G. Roybal.  See May 27th Tr. at 156:16-24 (Long, Nelson).

The Court concludes that the United States has corroborated John Doe 1's statements about the April 10, 2012 cocaine transaction through the intercepted wire communications, the text message, and agent Nelson's identification of G. Roybal's voice during the 10:53 p.m. phone call between C. Roybal and John Doe 1.

Christopher Roybal (recorded April 10, 2012, 9:59 p.m.), filed April 28, 2015 (Doc. 872-15)("April 10th Telephone Call, 9:59 p.m.")(admitted at hearing as Government Exhibit 15).

46.     John Doe 1 had previously been to G. Roybal's residence, located at 605 Parkside Place SE, on two prior occasions between 2011 and 2012.[15]  See May 27th Tr. at 77:24-79:9 (Long, Nelson); FBI Debrief with John Doe 1 at 2.

47.     On one occasion, he stopped by G. Roybal's residence at C. Roybal's request and he observed a trash bag overflowing with one-pound packages of marijuana and a backpack containing five kilograms of cocaine in G. Roybal's kitchen.[16]  See May 27th Tr. at 77:24-79:9 (Long, Nelson); FBI Debrief with John Doe 1 at 2.

48.     The morning after the cocaine transaction with John Doe 1, G. Roybal and C. Roybal speak on the telephone, and G. Roybal tells C. Roybal that his "shoes" - coded language for the funds from John Doe 1 – are at G. Roybal's house.  See May 27th Tr. at 75:5-15 (Long, Nelson); Summary of Events at 4.

49.     The second cocaine transaction on April 10, 2012, involved CHS-1, who purchased one kilogram of cocaine from the C. Roybal DTO.  See May 27th Tr. at 67:20-68:21 (Long, Nelson); Summary of Events at 3; FBI Debrief Following April 10, 2012 Controlled

---

[15]The Court incorporates its legal analysis from footnote 14 to find by a preponderance of the evidence that John Doe 1 had previously been to G. Roybal's residence, located at 605 Parkside Place SE, on two prior occasions between 2011 and 2012.

[16]The Court incorporates its legal analysis from footnote 14 to find by a preponderance of the evidence that on one occasion, John Doe 1 stopped by G. Roybal's residence at C. Roybal's request and he observed a trash bag overflowing with one-pound packages of marijuana and a backpack containing five kilograms of cocaine in G. Roybal's kitchen.  Moreover, this factual finding overrules G. Roybal's objection to the PSR's statement that G. Roybal was involved in the DTO as "he stored money and drugs" at his residence.  See Objections at 2.

Purchase at 1-2 (dated April 13, 2012), filed April 28, 2015 (Doc. 872-12)("April 10th

Controlled Purchase Debrief")(admitted at hearing as Government Exhibit 12).

     50.     On the morning of April 10, 2012, at 9:50 a.m., G. Roybal traveled to CHS-1's

house and briefly spoke with CHS-1 regarding the sale of one kilogram of cocaine to CHS-1.[17]

See May 27th Tr. at 67:20-68:21 (Long, Nelson); Summary of Events at 3; April 10th Controlled

Purchase Debrief at 1-2.

---

[17]Regarding the April 10, 2012 cocaine transaction with CHS-1, G. Roybal asserts that he did not travel to CHS-1's house. See June 1st Tr. at 35:17-38:1 (Winder, G. Roybal). Rather, he contends that he was replacing kitchen faucets at C. Roybal's house, and while outside, CHS-1 drove up. See June 1st Tr. at 35:17-38:1 (Winder, G. Roybal). According to G. Roybal, CHS-1 asked G. Roybal whether C. Roybal was home, and G. Roybal said no. See June 1st Tr. at 35:17-38:1 (Winder, G. Roybal). G. Roybal maintains that he then asked CHS-1 whether he had C. Roybal's phone number, to which CHS-1 responded yes. See June 1st Tr. at 35:17-38:1 (Winder, G. Roybal). According to G. Roybal, he instructed CHS-1 to call C. Roybal on the telephone. See June 1st Tr. at 35:17-38:1 (Winder, G. Roybal). Further, G. Roybal states that although he knew that CHS-1 was a convicted drug felon, he did not know why CHS-1 and C. Roybal wanted to meet, and that he did not want to know why they were meeting. See June 1st Tr. at 37:6-18 (Winder, G. Roybal).

The Court does not believe G. Roybal's version of the events of the morning of April 10, 2012, and the United States has offered sufficient evidence for the Court to find by a preponderance of the evidence that on the morning of April 10, 2012, at 9:50 a.m., G. Roybal traveled to CHS-1's house and briefly spoke with CHS-1 regarding the sale of one kilogram of cocaine to CHS-1. First, the United States has presented evidence that CHS-1 had arranged to meet C. Roybal at C. Roybal's house to purchase one kilogram of cocaine. See Summary of Events at 3. Second, the United States has offered evidence that at 9:28 a.m. on April 10, 2012, G. Roybal told C. Roybal that he was going to run that errand now. See Summary of Events at 3. Third, through physical surveillance, the United States observed G. Roybal go to CHS-1's house and speak with him briefly. See Summary of Events at 3. This evidence all corroborates CHS-1's statement in the FBI debrief that G. Roybal told CHS-1 not to call C. Roybal, and that if he did, to be very vague and to only discuss the time and location of the meet. See April 10th Controlled Purchase Debrief at 1-2. Finally, CHS-1 and C. Roybal later met up and C. Roybal provided one kilogram of cocaine to CHS-1. See Summary of Events at 3.

The Court concludes by a preponderance of the evidence that on the morning of April 10, 2012, at 9:50 a.m., G. Roybal traveled to CHS-1's house and briefly spoke with CHS-1 regarding the sale of one kilogram of cocaine to CHS-1. Further, the Court concludes by a preponderance of the evidence that (i) G. Roybal told CHS-1 not to call C. Roybal, and that if he did, to be very vague and to only discuss the time and location of a meet, and (ii) that C. Roybal later supplied CHS-1 with the one kilogram of cocaine.

51.     G. Roybal told CHS-1 not to call C. Roybal, and that if he did, to be very vague and to only discuss the time and location of a meet.[18]  See May 27th Tr. at 67:20-68:21 (Long, Nelson); Summary of Events at 3; April 10th Controlled Purchase Debrief at 1-2.

52.     Later, at 11:00 a.m., C. Roybal sold CHS-1 one kilogram of cocaine.  See May 27th Tr. at 68:3-21 (Long, Nelson); Summary of Events at 3; April 10th Controlled Purchase Debrief at 1-2.

53.     G. Roybal was also involved in a controlled purchase of marijuana on April 4, 2012.[19]  See May 27th Tr. at 81:16-82:3 (Long, Nelson); FBI Debrief Following April 4, 2012 Controlled Purchase at 1 (dated April 6, 2012), filed April 28, 2015 (Doc. 872-8)("April 4th Controlled Purchase Debrief")(admitted at hearing as Government Exhibit 8).

54.     On April 4, 2012, at approximately 11:42 a.m., G. Roybal arrived in a black Monte Carlo and delivered 1.7 pounds of marijuana to the CHS on behalf of C. Roybal.  See May 27th Tr. at 81:16-82:3 (Long, Nelson); April 4th Controlled Purchase Debrief at 1.

55.     On April 5, 2012, the CHS met with C. Roybal and paid $5,540.00 for the marijuana provided by G. Roybal on the previous day.  See PSR ¶ 24, at 13.

56.     On December 14, 2012, FBI agents executed a search warrant at G. Roybal's residence located at 605 Parkside Drive SE.  See PSR ¶ 29, at 14.

---

[18]The Court incorporates its legal analysis from footnote 17.

[19]G. Roybal has conceded that he was involved in the marijuana transaction on April 4, 2012.  See May 27th Tr. at 93:25-94:4 (Winder, Nelson)("Winder: And you're aware that Mr. George Roybal has conceded as well that he was involved with a marijuana transaction on April 4, 2012 as well, correct?  Nelson: Okay, yes."); June 1st Tr. at 66:21-24 (Winder, G. Roybal).

57.     Agents did not find any money or drugs at the residence, but they did locate five firearms, six cellular telephones, and a digital scale.  See PSR ¶ 29, at 14; May 27th Tr. at 151:23-152:24 (Long, Nelson).

58.     Three of the firearms found during the search of G. Roybal's residence were rifles and two were shotguns.  See PSR ¶ 29, at 14.

59.     None of the firearms were loaded with ammunition and G. Roybal kept no ammunition in the house.  See Transcript of Hearing at 70:10-16 (Winder, G. Roybal)(taken June 1, 2015)("June 1st Tr.").[20]

60.     A Savage Rifle Model 64 22LR was recovered in the den/dining room next to the front door.  See PSR ¶ 29, at 14.

61.     The Savage Rifle Model 64 22LR was wrapped in a box, had never been fired, and was a Christmas gift that G. Roybal bought for his daughter.  See PSR ¶ 29, at 14; June 1st Tr. at 68:21-69:18 (Winder, G. Roybal); Photograph of Savage Rifle Model 64 22LR, entered into evidence June 1, 2015 (admitted at the hearing as Government Exhibit 27).

62.     G. Roybal purchased and possessed the Savage Rifle Model 64 22LR solely for hunting, and not for drug trafficking.

63.     Under G. Roybal's bed, agents also discovered two rifles: a 308 Remington 700 rifle with a scope and a 243 Remington 7400 rifle with a scope and magazine.  See PSR ¶ 29, at 14.

64.     G. Roybal owned and possessed both the 243 Remington 7400 rifle with a scope and the 308 Remington 700 rifle with a scope solely for hunting, and not for drug trafficking.  See June 1st Tr. at 56:20-57:3 (Court, Winder, G. Roybal).

_____

[20]The Court's citations to the June 1st Tr. refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

65.     Agents also discovered two shotguns at G. Roybal's residence: a New England Padner Model 20-gauge shotgun under G. Roybal's bed and a Weatherby Ninety Two 12-gauge shotgun in G. Roybal's bedroom closet.  See PSR ¶ 29, at 14.

66.     J. Roybal's parents gave the New England Padner Model 20-gauge shotgun to him as a present for his eighth birthday, right after he completed his hunter safety course.  See June 1st Tr. at 55:25-56:7 (Court, Winder, G. Roybal); Photograph of G New England Padner Model 20-gauge shotgun, entered into evidence June 1, 2015 (admitted at the hearing as Defendant's Exhibit 32).

67.     J. Roybal used the 20-gauge shotgun to hunt dove and G. Roybal shot the gun several times while hunting.  See June 1st Tr. at 56:4-19 (Court, Winder, G. Roybal).

68.     G. Roybal owned and possessed the New England Padner Model 20-gauge shotgun solely for hunting, and not for drug trafficking.  See June 1st Tr. at 56:4-19 (Court, Winder, G. Roybal).

69.     G. Roybal used the Weatherby Ninety Two 12-gauge shotgun to hunt birds including dove, quail, pheasant, goose, and turkey, and that the weapon was a birthday gift to him from his wife and children.  See June 1st Tr. at 8:21-9:24 (Court, Long, J. Roybal); id. at 54:21-55:20 (Court, Winder, G. Roybal); Photograph of Weatherby Shotgun, entered into evidence June 1, 2015 (admitted at the hearing as Government Exhibit 30); June 1st Tr. at 9:20-10:18 (Court, Long, J. Roybal); id. at 55:10-20 (Court, Winder, G. Roybal); Photograph of G. Roybal with Turkey and Weatherby Shotgun, entered into evidence June 1, 2015 (admitted at the hearing as Defendant's Exhibit L).

70.     G. Roybal owned and possessed the Weatherby Ninety Two 12-gauge shotgun solely for hunting, and not for drug trafficking.  See June 1st Tr. at 8:21-9:24 (Court, Long, J. Roybal); id. at 54:21-55:20 (Court, Winder, G. Roybal).

71.     After G. Roybal's arrest in December 2012, he was released on conditions of supervision pending resolution of the federal charges against him.  See PSR ¶ 32, at 15; Plea Agreement ¶ 12, at 4-5, filed January 14, 2015 (Doc. 735)("Plea Agreement").

72.     At that time, G. Roybal learned that CHS-1, to whom C. Roybal and G. Roybal had distributed cocaine, was working at the direction of the FBI.  See Plea Agreement ¶ 12, at 4-5.

73.     On or about November 13, 2013, G. Roybal approached CHS-2 at CHS-2's workplace, Adelante Trucking, located in Albuquerque.  See PSR ¶ 32, at 15; Response at 16; Plea Agreement ¶ 12, at 4-5; May 27th Tr. at 80:10-81:15 (Long, Nelson); FBI Report at 1 (dated January 30, 2014)("Jan. 30th FBI Report")(admitted at the hearing as Defendant's Exhibit P).

74.     G. Roybal indicated to CHS-2 that G. Roybal knew CHS-1 was related to CHS-2. See PSR ¶ 32, at 15; Response at 16; Plea Agreement ¶ 12, at 5; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

75.     G. Roybal told CHS-2 that he knew about CHS-1's medical condition and that CHS-1 was going to end up in a wheel chair for what CHS-1 had done.[21]  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

---

[21]In his Reply, G. Roybal asserts that he did not admit in the Plea Agreement that he told CHS-2 that CHS-1 was going to end up in a wheelchair for what CHS-1 had done.  See Reply at 13.  The Court has made a credibility determination, however, and concludes that the description of what occurred on November 13, 2013 in the FBI reports is more accurate than G. Roybal's testimony at the sentencing hearing.  Further, in the Plea Agreement, G. Roybal conceded that:

76.    G. Roybal also stated that he and his people had been watching CHS-1's residence, and that they knew when the children came home.[22]  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

77.    G. Roybal added that he and his people were going to hit CHS-1 where it hurts the most, and make CHS-1's family pay.[23]  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

78.    G. Roybal further stated to CHS-2 that if CHS-1 went to Las Vegas, New Mexico, CHS-1 and CHS-1's family would be in grave danger.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

---

If this matter were to proceed to trial, I admit that the United States would prove that I used the threat of physical force against CHS-1 by threatening to cause physical harm to CHS-1 and CHS-1's family, with intent to influence, delay, and prevent the testimony of CHS-1 in an official proceeding, that being the trial in this underlying case.

Plea Agreement ¶ 12, at 5.  The Court thus finds by a preponderance of that evidence that G. Roybal told CHS-2 that he knew about CHS-1's medical condition and that CHS-1 was going to end up in a wheel chair for what CHS-1 had done.

[22]In his Reply, G. Roybal asserts that he did not admit in the Plea Agreement that he told CHS-2 that "he was going to hurt any child."  See Reply at 13.  For the reasons explained in footnote 21, the Court concludes that the description of what occurred on November 13, 2013 in the FBI reports is more accurate than what was testified to by G. Roybal at the sentencing hearing, and finds by a preponderance of the evidence that G. Roybal told CHS-2 that he and his people had been watching CHS-1's residence, and that they knew when the children came home.

[23]In his Reply, G. Roybal asserts that he did not admit in the Plea Agreement that he told CHS-2 that G. Roybal and his people were going to hit CHS-1 where it hurts the most and make CHS-1's family pay.  See Reply at 13.  For the reasons explained in footnote 21, the Court concludes that the description of what occurred on November 13, 2013 in the FBI reports is more accurate than G. Roybal's testimony at the sentencing hearing, and finds by a preponderance of the evidence that G. Roybal told CHS-2 that he and his people were going to hit CHS-1 where it hurts the most, and make CHS-1's family pay.

79.     CHS-2 told G. Roybal that CHS-1 babysits CHS-2's child on a regular basis and that CHS-2 did not want the child to be hurt.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

80.     G. Roybal responded to CHS-2: "oh well, you know how it is."[24]  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

## PROCEDURAL BACKGROUND

The Second Superseding Indictment, filed September 9, 2014 (Doc. 626)("Superseding Indictment"), charged G. Roybal with the following Counts: (i) Count 1, Conspiracy -- Distribution of 5 Kilograms and More of a Mixture and Substance Containing a Detectable Amount of Cocaine in violation of 21 U.S.C. § 846, and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); (ii) Count 5, Distribution of 500 grams or More of Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); (iii) Count 15, Distribution of a Controlled Substance, a Mixture and Substance Containing a Detectable Amount of Marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); (iv) Count 37, Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(h); (v) Counts 42-43, Use of a Telephone to Facilitate a Drug Trafficking Offense in violation of 21 U.S.C. § 843(b); and (vi) Count 61, Tampering with a Witness in violation of 18 U.S.C. § 1512(a)(1)(A).   See Superseding Indictment at 2-31.  On January 14, 2015, G. Roybal pled guilty to one count of Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. § 846, and one count of Witness Tampering, in

---

[24]In his Reply, G. Roybal asserts that he did not admit in the Plea Agreement that he told CHS-2 that "he was going to hurt any child."  See Reply at 13.  For the reasons explained in footnote 21, the Court concludes that the description of what occurred on November 13, 2013 in the FBI reports is more accurate than G. Roybal's testimony at the sentencing hearing, and finds by a preponderance of the evidence that G. Roybal told CHS-2: "oh well, you know how it is."

violation of 18 U.S.C. § 1512(a)(2)(A).  See Plea Agreement ¶ 3, at 2.  Among other things, the

Defendant's Admission of Facts in the Plea Agreement states:

> From on or from about August 2011 through on or about December 2012, I was involved in a conspiracy to distribute cocaine with co-defendant Christopher Roybal in the Albuquerque, New Mexico area.  Over the course of the conspiracy, I helped facilitate Christopher Roybal's cocaine distribution activities by distributing cocaine on Christopher Roybal's behalf and by helping to arrange cocaine deals for Christopher Roybal.
>
> During the course of the conspiracy, I frequently communicated with Christopher Roybal on his various and changing cellular telephones.  My telephone number was (505) 239-3039.  Unbeknownst to me at the time, the Federal Bureau of Investigation had received authorization to intercept communications over several of Christopher Roybal's telephones.
>
> After my arrest, I learned that a confidential human source (CHS1) to whom Christopher Roybal and myself had distributed cocaine was working at the direction of the FBI.  On or about November 13, 2013, while I was on pretrial release on this case, I approached another person, referred herein Confidential Human Source 2 (CHS2), at CHS-2's workplace, located in Albuquerque, New Mexico.  I knew that CHS2 was related to CHS1.  If this matter were to proceed to trial, I admit that the United States would prove that I used the threat of physical force against CHS1 by threatening to cause physical harm to CHS1 and CHS1's family, with the intent to influence, delay, and prevent the testimony of CHS1 in an official proceeding, that being the trial in this underlying case (12-3182 JB).

Plea Agreement ¶¶ 9-12, at 3-4.

The United States Probation Office ("USPO") re-disclosed the PSR on April 8, 2015.[25]

Relying on U.S.S.G § 2D1.1, the USPO calculates a base offense level of 26 for G. Roybal.  See

PSR ¶ 38, at 16.  The USPO applies a 2-level increase to G. Roybal's base offense level under §

---

[25]The USPO disclosed the original PSR on March 16, 2015.  The United States subsequently submitted an informal objection, asserting that an additional amount of drugs was attributable to G. Roybal, which would result in a guideline calculation increase from a base offense level of 24 to 26.  The USPO agreed with the United States, and therefore re-disclosed the PSR with an increase in the base offense level from 24 to 26.  According to the USPO, this increase in the guideline calculations resulted in changes throughout the presentence report.  The Court will address whether the 24 or 26 base offense level is correct in this MOO's analysis section.

2D1.1(b)(1), because, during the search of G. Roybal's residence, agents located five firearms within the home.  The USPO states:

> Three of the firearms were located under the bed in the master bedroom and a digital scale was located in the kitchen.  This was a residence that was identified as a stash house and, therefore, based on the unsecured firearms located under the defendant's bed, a two level increase is warranted.

PSR ¶ 43, at 17.  The USPO also applies a 2-level increase pursuant to § 2D1.1(b)(12), because that section provides that, if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels.  See PSR ¶ 44, at 17.  According to the USPO, a 2-level increase is warranted under § 2D1.1(b)(12), because G. Roybal's home was used to store drugs and cash for the DTO.  See PSR ¶ 44, at 17-18.  Further, the USPO applies a 2-level increase under § 3C1.1, because

> [t]he defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense; therefore, two levels are added.  The instant offense involved the defendant threatening a witness.

PSR ¶ 48, at 18.  The USPO next applies a 3-level increase under § 3C1.3 pursuant to 18 U.S.C. § 3147 for G. Roybal committed the offense of Tampering with a Witness while on release.  See PSR ¶ 49, at 18.  The USPO then recommends a 3-level decrease for G. Roybal's acceptance of responsibility.  See PSR ¶¶ 52-53, at 18.  The PSR thus calculates G. Roybal's total offense level to be 32.  See PSR ¶ 54, at 18.  The PSR also calculates a criminal history category score of 0.  See PSR ¶¶ 56-62, at 19-20.  G. Roybal's total offense level of 32 and criminal-history category I results in a Guideline imprisonment range of 121 months to 151 months.  See PSR ¶ 92, at 26.

1.      **G. Roybal's Sentencing Memorandum.**

G. Roybal filed his Objections on April 14, 2015.  G. Roybal first objects to the PSR's application of the 2-level enhancement under § 2D1.1(b)(1).  See Objections at 8.  According to G. Roybal, § 2D1.1(b)(1) is inapplicable in this case, because one of the guns that was retrieved from his residence was an heirloom birthday gift and another was a Christmas gift to his daughter.  See Objections at 8.  Additionally, G. Roybal maintains that the remaining weapons were used for hunting purposes and that he has been an avid licensed hunter for over thirty-five years.  See Objections at 8.  G. Roybal argues that a § 2D1.1(b)(17) adjustment is also not warranted.  See Objections at 9.  According to G. Roybal, § 2D1.1(b)(17) applies if "the defendant maintained a premises for the purposes of manufacturing or distributing a controlled substance. . . ." and G. Roybal contends that the home where he resided was not maintained for the purpose of manufacturing or distributing a controlled substance.  Objections at 9.  Further, G. Roybal asserts that no drugs or cash were found at the home.  See Objections at 9.

G. Roybal next objects to the USPO's application of the § 3C1.1 adjustment for obstruction of justice.  See Objections at 9.  G. Roybal's Plea Agreement states, in pertinent part:

### RECOMMENDATIONS

14.      Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend as follows:

a.      USSG § 2J1.2, Obstruction of Justice, is the sentencing guideline that should apply to Count 61, Tampering with a Witness.

Plea Agreement at 5.  G. Roybal contends that,

[i]n the plea agreement, the parties agreed that "USSG § 2J1.2, Obstruction of Justice, is the sentencing guideline that should apply to Count 61, Tampering with a Witness."  The application note to U.S.S.G. § 3C1.1 sets forth the following: "If

> the defendant is convicted of an offense covered by . . . § 2J1.2, Obstruction of Justice . . . this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense.)."  In this case, Mr. Roybal did not threaten any witness during the course of the prosecution for the obstruction offense.

Objections at 9 (emphasis in original). Accordingly, G. Roybal asserts that the Court should reject the USPO's assessment of 2 levels under § 3C1.1.  See Objections at 9.

G. Roybal objects to the base level offense that the PSR sets forth.  See Objections at 9. G. Roybal states that the USPO correctly calculated the base offense level as 24 in the original PSR.  According to G. Roybal, however, "[t]he information that the United States Probation Office relies upon to increase the offense level from 24 to 26 is solely based upon the information the United States recently provided."  Objections at 9-10 (emphasis in original).

> Mr. Roybal entered a guilty plea to a one-count information on January 14, 2015. Over two months later, the United States provided undersigned counsel discovery from confidential informants.  These informants have no credibility.  Up to March 30, 2015, the United States had not provided any information with regard to these confidential informants.  Mr. Roybal is not disputing the credibility of the FBI Agents who conducted the interviews.  Mr. Roybal is disputing the credibility of the confidential informants.  It can be presumed that these confidential informants are receiving benefits through their allegations.  Mr. Roybal submits that this Court not consider their self-serving statements without these persons coming into Court for an evidentiary hearing.

Objections at 10 (emphasis in original).  G. Roybal requests the Court, therefore, to calculate the base level at 24.  See Objections at 10.

Finally, G. Roybal contends that a 4-level reduction from a base level of 24 is warranted under § 3B1.2(a).  See Objections at 10.  According to G. Roybal, § 3B1.2(a) provides that a decrease of 4 levels is appropriate if the defendant was a minimal participant.  See Objections at 10.  Further, G. Roybal states that the application note to § 3B1.2(a) establishes that "[s]ubsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal

role in concerted activity." Objections at 10.  G. Roybal asserts that he was not the leader of the

drug organization and that his role was "limited to transporting drugs" for C. Roybal.  Objections

at 10.  G. Roybal contends that, while in his Admission of Facts, he admitted to "helping

facilitate" and "helping arrange cocaine deals" for C. Roybal, he "lacked knowledge or

understanding of the scope and structure of the enterprise and of the activities of others."

Objections at 10.  Specifically, G. Roybal states that he did not know of the drug organization

that C. Roybal had created.  See Objections at 10-11.

> In the FD-302 that the United States has provided, Mr. Roybal discussed a "pending transaction . . ."  Mr. Roybal spoke with the confidential informant, but Mr. Roybal did not deliver any cocaine.
> Mr. Roybal's culpability is close to the person identified in the same sphere as the three other woman [sic] who received probated sentences. Specifically, Mr. Roybal is identified in the sphere identified as "Drug Mules" on page 12 of the PSR.  The United States viewed these three woman [sic] as "drug mules" and they received a significant benefit.

Objections at 11.  In sum, G. Roybal requests that the Court reduce the offense level by 4 levels

based upon G. Roybal's allegedly minimal role in the Roybal DTO.  See Objections at 11.

### 2.    The Addendum.

On April 16, 2015, the USPO responded to the Objections.  See Addendum to the Re-

Disclosed Presentence Report, disclosed April 16, 2015 ("Addendum").  In response to G.

Roybal's first Objection, the USPO concludes that the adjustment will remain unchanged.  See

Addendum at 1.  The USPO explains:

> The United States Probation Office attributed the firearm located by the front door of the residence to the drug activity which consisted of storing drugs and drug monies.  Upon further contact with the case agent, he confirmed with the agent in charge of the search at defendant's residence that the firearm by the front door was wrapped.  This information was added to the re-disclosed presentence report. It is noted, there were additional firearms located in his residence under the defendant's bed and they were accessible as they were not secured.  The defendant's residence was identified as a "stash house," thus, based on this information the adjustment will remain unchanged at this time.

Addendum at 1.

Addressing G. Roybal's second objection, the USPO says that the enhancement under § 2D1.1(b)(12) applies "based on information contained in discovery, which identified the defendant's residence as a stash house where drugs and money were stored for C. Roybal." Addendum at 2.  The USPO concedes that neither drugs nor cash were found at the time the search warrant was executed; according to the USPO, however, the investigation revealed money and drugs were stored at the residence.  See Addendum at 2.  The USPO concludes, therefore, that the enhancement under § 2D1.1(b)(12) is warranted.

Regarding G. Roybal's third objection -- that an enhancement is unwarranted under § 3C1.1 -- the USPO responds that a 2-level increase is warranted, because G. Roybal's conduct consisted of threatening, intimidating or otherwise unlawfully influencing a confidential informant.  See Addendum at 2.  In response to G. Roybal's fourth objection, the USPO contends that it added the information from confidential informants once it received the material from the United States.  See Addendum at 2.  According to the USPO, "[t]he additional drug quantity increased the offense level and as such the presentence report was re-disclosed."  Addendum at 2.  Moreover, the USPO states that an evidentiary hearing may be required for the parties to resolve disputed confidential informant issues.  See Addendum at 2.

Addressing G. Roybal's fifth objection -- that the Court should grant a 4-level reduction because G. Roybal was a minimal participant in the offense -- the USPO explains:

> The United States Probation Office did not assess an aggravating or mitigating role adjustment as to this defendant.  While the defendant was actively involved in drug transactions and in storing drugs and money for the DTO, he did not appear to be directing anyone in the conspiracy for an aggravated role adjustment. However, based on this conduct, the defendant also did not have a mitigating role in the offense.  This is further evidenced by his subsequent conduct in tampering with a witness.

Addendum at 2.

### 3.    The Response

The United States responded to the Objections on April 28, 2015.  See Response at 1.

The United States asks the Court to sustain G. Roybal's objection to the PSR's § 2D1.1(b)(1)

application.  See Response at 17.  The United States asserts that § 2D1.1(b)(1)'s application note

11 clarifies the scope of the enhancement:

> The enhancement for weapon possession in subsection (b)(1) reflects the
> increased danger of violence when drug traffickers possess weapons.  The
> enhancement should not be applied if the weapon was present, unless it is clearly
> improbable that the weapon was connected with the offense.  For example, the
> enhancement would not be applied if the defendant, arrested at the defendant's
> residence, had an unloaded hunting rifle.

Response at 17 (quoting U.S.S.G. § 2D1.1(b)(1), app. n. 11).  First, regarding the rifle in the

front room, the United States agrees that it was in a box and appears to be new.  See Response at

17.  Second, as to the other firearms located in G. Roybal's residence, the United States contends

that "the reports related to the search warrant did not indicate whether the rifles were loaded" and

that "there is no mention of ammunition in the evidence log."  Response at 18.  Based on this

information, the United States assumes that the weapons were not loaded.  See Response at 18.

Moreover, the United States agrees that the three rifles under the bed and the one in the closet are

consistent with rifles used for hunting, noting that there are other indications in G. Roybal's

house that he was, in fact, a hunter.  See Response at 18.  The United States concludes that "the

location of the weapons (being in the master bedroom, other than the new rifle in the box in the

living room) and the fact that they appear to have been unloaded counsel against assessing this

enhancement."  Response at 18.

The United States similarly asks the Court to sustain G. Roybal's objection to the USPO's application of an enhancement under § 2D1.1(b)(12), which allows for a 2-level increase where a premises is maintained for the purpose of manufacturing or distributing a controlled substance.  See Response at 18.  The United States first cites to application note 17, which in pertinent parts, states:

> Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.
>
> . . . .
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises.  In making this determination, the court should consider how frequently the premises was used by the defendant for . . . distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

Response at 18 (quoting U.S.S.G. § 2D1.1, app. n.17).

The United States states that it disagrees with the PSR's description of G. Roybal's residence on Parkside as a "stash house."  Response at 19.  The United States states that, based on the evidence in the case,

> the defendant offered his house on Parkside to Chris Roybal and Chris' various associates for the purpose of facilitating drug transactions.  Over the year-and-a-half investigation, we know of several drug deals and drug-related transactions (such as the payment of proceeds) that occurred there, including (i) Granado delivering drug proceeds to George at George's residence on March 14, 2012, (ii) George keeping the $13,000 cash that George picked up from John Doe 1 on April 10, 2012, at George's house; (iii) the April 11, 2012 events in which Chris and George retrieved the $26,500 from a bedroom in George's house for John Doe 3 to take to California; (iv) John Doe 1 stating that John Doe 1 observed other drugs (cocaine and marijuana) at George's residence; and (v) the discovery of a digital scale in George's kitchen.  These events demonstrate George's intricate involvement in the conspiracy, discussed in greater detail below.

Response at 19.   In light of this evidence and because the Parkside residence was also G. Roybal's principal residence that he shared with his family, the United States concludes that it does not fit within the definition set forth in § 2D1.1(b)(12)'s application notes and that the enhancement should not apply.  See Response at 19.

The United States next asks the Court to overrule G. Roybal's third objection, to the USPO's application of the § 3C1.1 adjustment for obstruction of justice.  See Response at 22 (citing PSR ¶ 48, at 18).  The United States contends that G. Roybal's argument that "he did not threaten any witness during the course of the prosecution for the obstruction offense" is a confusing and circular argument.  See Response at 22.  According to the United States, the facts indicate that G. Roybal purposefully sought to dissuade testimony of one of the United States' key witnesses, CHS-1, by threatening to harm CHS-1 and his family.  See Response at 22.

The United States likewise requests that the Court overrule G. Roybal's objection to the base level offense of 26, the PSR sets forth.  See Response at 19.  The United States contends that there is sufficient information, based upon twenty-six exhibits attached to the Response, to support an offense level of 26, as the PSR reflects.  See Response at 19-20.  According to the United States, under § 2D1.1(c)(7), the United States must establish at least 2 kilograms but less than 3.5 kilograms of cocaine for an offense level of 26.  See Response at 20.  By contrast, for an offense level of 24, the United States must establish at least 500 grams but less than 2 kilograms of cocaine.  See Response at 20.  The United States asserts that two of the transactions would establish an offense level of 24.  See Response at 20.  First, G. Roybal delivered approximately two pounds of marijuana to CHS-1 on April 4, 2012.  See Response at 20.  Second, G. Roybal went to CHS-1's house on April 10, 2012, regarding the one-kilogram of cocaine transaction and directed the CHS-1 to not discuss the details of the transaction with C. Roybal over the

telephone.  See Response at 20.  The United States maintains, however, that it has established at

least one additional transaction involving a kilogram of cocaine in which G. Roybal was

involved.  See Response at 20.

>       This relates to the April 10, 2012, delivery of one-kilogram of cocaine to
> John Doe 1.  As noted above, agents intercepted a series of calls between John
> Doe 1 and Chris in which John Doe 1 is complaining about quality issues related
> to cocaine provided previously.  John Doe 1 and Chris further discussed Chris
> delivering an additional kilogram of cocaine.  Then, on April 10, 2012, John Doe
> 1 called Chris and tells Chris that "your uncle just called me and he'll be at my
> pad in like a [UI] half an hour."  See Exhibit 15.  Earlier in the evening, George
> texted Chris about having gotten a speeding ticket, claiming that Chris had
> unplugged George's radar detector.  See Exhibit 14.  When George arrived at
> John Doe 1's house, John Doe 1 told Chris that they were "checking it out now"
> (referring to the kilogram of cocaine).  Notably, Chris then had John Doe 1 give
> George a hard time about the speeding ticket, and you can hear George in the
> background of the call.  This evidence, when couple with John Doe's recitation of
> events, demonstrates that George is responsible for an additional kilogram of
> cocaine.  This is sufficient to establish at least 2 kilograms as required for an
> offense level of 26.
>
>       In addition, the United States has also demonstrated that George was
> involved in the money laundering conspiracy related to the use of a courier, John
> Doe 3, to send drug proceeds to California on April 11, 2012.  After John Doe 3's
> arrival and a quick stop at TD's North, John Doe 3, Chris, another co-defendant,
> and George all met at George's house.  It is at George's house that George and
> Chris then retrieved the cash from one of the bedrooms.
>
>       George then accompanied Chris and John Doe 3 to the airport.  In his
> objections, George felt the need to clarify that he did not, in fact, board the
> airplane.  Everyone is in agreement on that point.  The whole point of George
> going to the airport that day was to help John Doe 3 and Chris bring the $36,500
> through security.  Once on the other side of security, John Doe 3 collected the
> portion George carried.  See Exhibit 23.  Thus, there is sufficient evidence to
> include these proceeds in the calculations of the defendant's drug quantity.

Response at 21.  The United States counters G. Roybal's concern over the reliability of the

cooperators, maintaining that the Court need not rely solely on the information which they

provided to find G. Roybal responsible for the drug proceeds sent by courier to California.  See

Response at 21.  The United States asserts that there are intercepted wire communications and

agent surveillance, which place G. Roybal with Cameron at the airport on April 12, 2012.  See

Response at 21.   In sum, the United States argues that it has established that G. Roybal is

responsible for at least two kilograms of cocaine or its equivalent, resulting in an offense level of

26 with respect to drug quantity.  See Response at 22.

Last, the United States asks the Court to overrule G. Roybal's fifth and final objection, in

which he requests that the Court decrease his offense level an additional 4 levels for being a

minimal participant pursuant to § 3B1.2(a).  See Response at 22.  The United States agrees with

the USPO that G. Roybal's level of criminal culpability is such that he is ineligible for any such

role adjustment.  See Response at 22.  The United States explains:

> As the application notes caution, for this adjustment to apply, the defendant must
> be one who is "plainly among the least culpable of those involved in the conduct
> of a group."  See USSG § 3B1.2, app. n. 4.  And that "the defendant's lack of
> knowledge or understanding of the scope and structure of the enterprise and of the
> activities of others is indicative of a role as a minor participant."  Id.  As discussed
> herein, George played an integral role in this conspiracy, from providing a safe
> location for various drug deals and drug-related activity to take place to being a
> point of contact if Chris was unavailable.  George is a far cry from those
> contemplated by the sentencing commission when crafting this mitigating role
> adjustment.  As such, the Court should overrule this objection as well.

Response at 22-23.  Without enhancements under § 2D1.1(b)(1) and § 2D1.1(b)(12), the United

States therefore concludes that the adjusted offense level should be 28, resulting in an advisory

guideline range of 78 to 97 months.  See Response at 23.

**4.      The Reply.**

G. Roybal replied to the Response on May 12, 2015.  See Sealed Reply to United States'

Sealed Response to Defendant Roybal's Sentencing Memorandum, filed May 12, 2015 (Doc.

914)("Reply").  G. Roybal first renews the arguments set forth in his Sentencing Memorandum

and then provides an analysis of the twenty-six exhibits attached to the United States' Response.

See Reply at 1.  G. Roybal contends that the majority of the exhibits attached to the Response

make no reference to G. Roybal.  See Reply at 1.  G. Roybal urges the Court to accept the arguments from both parties that enhancements under § 2D1.1(b)(1) and § 2D1.1(b)(17) should not be applied. See Reply at 1.  G. Roybal also requests an evidentiary hearing in this matter. See Reply at 2.

G. Roybal provides an analysis of the twenty-six exhibits attached to the Response, contending that they do not establish that the base level should be increased from 24 to 26.  See Reply at 2-12.  In sum, G, Roybal asserts that G. Roybal was not C. Roybal's right hand man and that he was involved in only two drug transactions, on April 4, 2012 and April 10, 2012.  See Reply at 11.  According to G. Roybal, his involvement in these two transactions establishes an offense level of 24, and not 26, as the USPO and the United States assert. See Reply at 11-12.

G. Roybal next attacks the application of an enhancement under § 3C1.1.  See Reply at 13.  First, G. Roybal contends that he did not admit to several of the statements that the United States attributed to him in its Response.  See Reply at 13.  According to G. Roybal, he did not admit that he "told CHS-2 that CHS-1 was going to end up in a wheelchair for what CHS-1 did and that George and his people were going to hit CHS-1 where it hurts the most and make CHS-1's family pay."  Reply at 13.  G. Roybal asserts that "he did not tell anyone that that [sic] he was going to hurt any child."  Reply at 13.  Second, G. Roybal renews his argument set forth in his Sentencing Memorandum that § 3C1.1 is not applicable in this case.  See Reply at 13.  G. Roybal maintains that, contrary to the United States' assertion, his argument is not circular.  See Reply at 13.  G. Roybal explains:

> It is logical and consistent with the application note to U.S.S.G. § 3C1.1.  In the plea agreement, the parties agreed that "USSG § 2J1.2, Obstruction of Justice, is the sentencing guideline that should apply to Count 61, Tampering with a Witness."  The application note to U.S.S.G. § 3C1.1 make reference to § 2J1.2. The application note sets forth: "If the defendant is convicted of an offense covered by . . . § 2J1.2, Obstruction of Justice . . . this adjustment is not to be

applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense). In this case, Mr. Roybal was convicted of an offense covered by § 2J1.2 and he did not threaten any witness during the course of the prosecution for the obstruction offense.

G. Roybal therefore requests that the Court reject the USPO's assessment of an additional 2 levels under § 3C1.1. See Reply at 13-14.

G. Roybal renews his sixth argument from his Sentencing Memorandum that a 4-level reduction is warranted under § 3B1.2(a) because of his minimal role in the C. Roybal DTO. See Reply at 14. G. Roybal re-asserts that he did not have knowledge or understanding of the scope and structure of the enterprise and of the activities of others participating in the C. Roybal DTO. See Reply at 14. G. Roybal maintains that he was a minimal participant in this case and that the Court should reduce his offense level by 4 levels. See Reply at 14-15.

### 5. The May 27, 2015, June 1, 2015, and June 2, 2015, Evidentiary Sentencing Hearings.

The Court held evidentiary sentencing hearings on May 27, 2015, June 1, 2015, and June 2, 2015. See May 27th Tr. at 1; June 1st Tr. at 1; Transcript of Hearing (taken June 2, 2015)("June 2nd Tr.").[26] At the May 27, 2015, hearing, the Court began by confirming with G. Roybal that he has only five objections to the PSR, see May 27th Tr. at 3:2-9 (Court, Winder), and then provided the parties with its proposed ruling on each of the objections, see May 27th Tr. at 6:4-25:9 (Court). In sum, the Court explained that it was inclined to overrule G. Roybal's first four objections and: (i) impose a 2-level adjustment under § 2D1.1(b)(1) because G. Roybal possessed a dangerous weapon in connection with a drug-trafficking offense; (ii) impose a 2-level adjustment under § 2D1.1(b)(12) because G. Roybal maintained his house for the purpose

---

[26]The Court's citations to the June 2nd Tr. refer to the final version.

of manufacturing or distributing a controlled substance; (iii) impose a 2-level adjustment under § 3C1.1 for willfully obstructing or impeding the administration of justice; and (iv) increase G. Roybal's base offense level from 24 to 26.  See May 27th Tr. at 6:4-25:1 (Court).  The Court stated, however, that it was still determining how it was inclined to rule on G. Roybal's fifth objection, which was a request for a 4-level reduction under § 3B1.2(a).  See May 27th Tr. at 25:2-9 (Court).

The United States then called Agent Reineke Nelson, a task force officer with the FBI that worked on Operation Rain Check, to testify.  See May 27th Tr. at 27:6-165:16 (Court, Long, Nelson).  Nelson testified regarding the enhancement under § 2D1.1(b)(1), as well as the other objections.  See May 27th Tr. at 27:6-165:16 (Court, Long, Nelson).  Agent Nelson testified that G. Roybal was C. Roybal's right-hand man.  See May 27th Tr. at 31:13-16 (Long, Nelson).  In particular, Nelson testified regarding the drug transactions in which G. Roybal was allegedly involved, his role in the C. Roybal DTO, and any benefits that CRS-1 and CRS-2 were receiving for their cooperation.  See May 27th Tr. at 27:6-165:16 (Court, Long, Nelson).  G. Roybal's counsel, Samuel L. Winder, subsequently cross-examined Nelson, see May 27th Tr. at 82:4-154:6 (Winder, Nelson), and the United States then conducted a redirect, see May 27th Tr. at 154:7-165:16 (Long, Nelson).  At the conclusion of the May 27, 2015, hearing, the Court and the parties agreed that the Court should refrain from issuing any opinions addressing G. Roybal's objections to the PSR until G. Roybal had an opportunity to present his witnesses at a later date. See May 27th Tr. at 167:5-23 (Court, Long, Winter).

The Court held a second evidentiary sentencing hearing on June 1, 2015.  See June 1st Tr. at 1.  Mr. Winder indicated that he intended to call at least two witnesses and that G. Roybal would take the stand.  See June 1st Tr. at 3:3-7 (Court, Winder).  Mr. Winder first called,

however, Joshua Roybal, G. Roybal's son.  See June 1st Tr. at 3:2-13:24 (Court, J. Roybal, Winder).  J. Roybal testified as to G. Roybal's interest in hunting, the firearms discovered at G. Roybal's residence during the FBI's execution of a search warrant there on December 14, 2012, and J. Roybal's knowledge of G. Roybal's role in the C. Roybal DTO.  See June 1st Tr. at 3:2-13:24 (Court, Winder, J. Roybal).  The United States subsequently cross-examined J. Roybal, see June 1st Tr. at 13:22-14:24 (Court, J. Roybal, Long), and Mr. Winder conducted a redirect, see June 1st Tr. at 15:1-15 (Court, J. Roybal, Winder).  Mr. Winder next called G. Roybal to the stand.  See June 1st Tr. at 15:19-134:6 (Court, G. Roybal, Winder).  G. Roybal testified regarding his family situation, employment and educational history, career as a nurse, and his role in the C. Roybal DTO.  See June 1st Tr. at 15:19-134:6 (Court, G. Roybal, Winder).  Given G. Roybal's testimony, the United States re-called Nelson to the stand, who testified, in particular, regarding G. Roybal's role in the events of April 11, 2012, during which the C. Roybal DTO completed a transaction at the airport.  See June 1st Tr. at 134:11-145:6 (Court, Long, Nelson); June 2nd Tr. at 17:18-19:11 (Court, Long, Nelson, Winder).

In light of the evidence presented at the hearings, the Court sustained G. Roybal's objection to an enhancement under § 2D1.1(b)(1), concluding that G. Roybal did not possess a dangerous weapon in connection with a drug-trafficking offense.  See June 2nd Tr. at 23:19-23 (Court).  The Court next heard argument on the stash-house enhancement under § 2D1.1(b)(12), which provides for a 2-level adjustment when the defendant maintains his or her residence for the purpose of manufacturing or distributing a controlled substance.  See June 2nd Tr. at 7:8-17:17; June 2nd Tr. at 19:12-25:7.  The Court overruled the objection to the PSR's application of § 2D1.1(b)(12) concluding:

I'm still inclined to think that the three incidents that the Probation Office has identified, I think by a preponderance of the evidence I could find that, given the

cellular telephones, the digital scale, the fact that the Roybals kept a large quantity of money and drugs at the house, makes it more likely than not that Mr. Roybal maintained the premises for the purpose of manufacturing and distributing a controlled substance.[27]

June 2nd Tr. at 25:8-26:13 (Court).  The Court then heard arguments on G. Roybal's objection to the 2-level enhancement under § 3C1.1.  See June 2nd Tr. at 26:13-42-10 (Court, Long, Winder). Mr. Winder re-asserted the argument from G. Roybal's Sentencing Memorandum and Reply that a 2-level enhancement under § 3C1.1 is not warranted.  According to Mr. Winder, the Rule 11(c)(1)(B) plea agreement recommends that U.S.S.G. § 2J1.2, Obstruction of Justice, is the sentencing guideline that should apply to Count 61, Tampering with a Witness, and the application notes to § 3C1.1 state that, if the defendant is convicted of an offense covered by § 2J1.2, the § 3C1.1 adjustment is not to be applied for the offense level for that offense.  See June 2nd Tr. at 27:13-28:12 (Winder).

The Court expressed concern with Mr. Winder's argument, asking whether, in this case, G. Roybal was getting the § 3C1.1 enhancement for the drug charge and not for the tampering with a witness charge.  See June 2nd Tr. at 28:13-22 (Court).  The USPO clarified that the drug charge and the tampering with a witness charge were grouped.  See June 2nd Tr. at 28:23-29:1 (Court, Probation Officer).   Mr. Winder did not, however, withdraw his objection to the enhancement under § 3C1.1, explaining:

---

[27]The Court recognizes that § 2D1.1(b)(12) applies to defendants who "maintained a premises for the purpose of manufacturing _or_ distributing a controlled substance."  § 2D1.1(b)(12) (emphasis added).  At the June 2, 2015, sentencing hearing, the Court concluded that it was more likely than not that G. Roybal "maintained the premises for the purpose of manufacturing _and_ distributing a controlled substance."   June 2nd Tr. at 25:8-26:13 (Court)(emphasis added).  The Court now clarifies, as is reflected in this MOO's analysis section, that it does not conclude by a preponderance of the evidence that G. Roybal maintained his residence for the purpose of manufacturing a controlled substance; rather, it finds that he maintained his residence for the purpose of distributing a controlled substance.  In sum, the Court relies upon the "distributing" language of § 2D1.1(b)(12), rather than the "manufacturing" language of that section, to apply a 2-level enhancement in this case.

And so I maintain my argument that Paragraph 7 -- Your Honor, I believe that Paragraph 7 controls here, and that this two-level enhancement should not be included. . . . The language that was included in this enhancement was negotiated. There was language in there that was included. . . . I would ask that you not include the two-point enhancement. We've conceded that under 18 U.S.C. 3147, that three-level enhancement should be applied. That three-level enhancement is two years, essentially. If we add the two, that's three years, Your Honor. So I'd ask that you not apply the two-level enhancement, your Honor.

June 2nd Tr. at 32:6-34:19 (Court, Winder). The United States countered:

Now, when Probation determined that these counts group -- and that's at Paragraph 41 -- and what we should have done in the plea agreement then was to add additional prefatory language: If the United States Probation Office determines that these counts do not group, 2J1.2 should apply. But because Probation determined that the counts do group, that means that we got kicked into the enhancements applicable under 3C1.1 and 3C1.3.

Now, to take Mr. Winder's position and to sustain his objections would do two things. It's important to realize that we have two separate types of conduct at play in this case. We have threatening to cause physical harm to witness, and then we have he did so while on supervised release. 3C1.1, which is contained in the enhancement in Paragraph 48 of the revised PSR, takes into account that this defendant threatened to cause physical injury to a witness, and that's pursuant to 3C1.1.

The commentary that the defendant is relying on in terms of Application Note 7, that talks about, if you're convicted of an offense under 2J1.2. So let's say we didn't have the underlying drug offense, so there was no grouping, then he only stands before the Court on the witness tampering. What that application note says is that this enhancement, the 3C1.1, may not apply.

June 2nd Tr. at 36:8-37:12 (Long). The Court ultimately overruled G. Roybal's objection to the

application of the 2-level enhancement under § 3C1.1:

For the reasons that I kind of gave at the beginning of the hearing two days ago, as far as I had to make some credibility determinations. And given his statements to the United States Magistrate Judge in the plea agreement, I do think the description of what occurred in the FBI reports is more accurate than what was testified to yesterday. And so I'm going to overrule the objection and I'll apply the two-level enhancement.

June 2nd Tr. at 41:24-42:10 (Court). The parties next re-asserted their arguments whether the

base offense level should be increased from 24 to 26 based upon the quantity of drugs with

which G. Roybal was involved. See June 2nd Tr. at to 43:1-67:4 (Court, Long, Winder). The

Court overruled G. Roybal's objection to the increase from 24 to 26 in the base offense level,

explaining:

> I think I've had the Government outline why there is good cause for the nondisclosure of the informant's activity. And I've indicated earlier in this hearing that I think the out-of-court declarations have not -- their credibility hasn't really been successfully challenged. Many of the statements that they made were corroborated by intercepted wire communications or photographs or agent surveillance. And so I determine that their statements are credible.
>
> I said a minute ago I couldn't consider them, or wasn't considering them for any other purpose. I was just -- in listening that information, I was trying to get the good cause for the nondisclosure of the informant's identity. I think I can consider many of the other things related to the informants. So I don't need to narrow what I can consider in any way in these proceedings. So I think there is sufficient corroboration for the informants' -- the unidentified informants' statements here.
>
> Specifically, as to the April 10, 2012, and April 11, 2012 drug transactions involving Mr. Roybal, I think the United States has corroborated its confidential sources' statements about those two transactions. With respect to the April 10th transactions, they presented the intercepted wire communications, identified who that was in the background to corroborate the source's description of the transaction.
>
> In respect to the April 11 transaction, the United States had surveillance footage, agent surveillance, that corroborated the agent's description of the transaction that day.
>
> So I think the United States has sufficiently established that Mr. Roybal was involved with trafficking two additional kilograms of cocaine, for Mr. Roybal's base offense level to be 26, rather than 24. So I'm going to overrule that objection.

June 2nd Tr. at 67:18-69:6 (Court).

The parties then took up argument on G. Roybal's fifth objection -- that G. Roybal should

receive a reduction for his minimal role in the C. Roybal DTO. See June 2nd Tr. at 70:21-25

(Court, Winder). The Court decided to overrule G. Roybal's objection, stating:

> I agree with the Government, it's difficult in a case like this in which you have a central player like Chris Roybal, but then you have spin-off drug mules, money laundering, cocaine distribution, Santa Fe, Las Vegas; you've got California, the money laundering, then you've got Albuquerque, you've got Florida, you've got a lot of different operations going on here under Operation Raincheck. It's hard to, across the board, come up with an average participant.

But I still think that the guideline 3B1.2 is instructive in looking, that the person has to be substantially less culpable than the average participant. I'm not really sure I can say on the evidence before me -- while there is no doubt that Christopher Roybal is the person that's running this show -- that George Roybal is substantially less culpable than even him, much less whoever we would define the average participant to be.

. . . .

And I think the Government has shown by a preponderance of evidence the circumstances that I'm going to rely upon here to find that there is not an appropriate basis for a mitigating role adjustment. And as we know, it's -- the defendant has the burden of proving by a preponderance of the evidence that he was less culpable than most other participants. And I don't think the [. . .] defendant has met that burden.

. . . .

Again, I'm relying upon those three significant events in which I think Mr. Roybal was connected with the DTO. The March 16 drop-off of the money that George Roybal -- Granado dropping off the money at the Roybal residence that he owed to Chris Roybal for a prior drug transaction; the April 11th transaction, when they retrieved $31,000 from the bedroom; and the CHS describing an occasion in which he observed these trash bags and backpack. And I've indicated I thought those were reliable.

I think all of these events suggest that Mr. Roybal was aware -- if not the full scope of Christopher Roybal's Drug Trafficking Organization, which is one of the factors you look to in these mitigating role situations -- but at least had a real sense of how broad it was.

. . . .

As I indicated earlier about the premises enhancement, in addition to these incidents -- and the Government has pointed out more -- and I think I can rely on those as well -- a search of George Roybal's residence uncovered six cellular telephones, a digital scale. And I'll put aside the shotguns. But I think those suggest that Mr. Roybal was an integral player in the Christopher Roybal DTO. So I'm not going to give the defendant any sort of the role adjustment in this case. And I'm going to overrule the objection to the -- Probation's presentence report.

June 2nd Tr. at 110:21-114:10 (Court).

With all five of G. Roybal's objections to the PSR resolved, the Court concluded that the

total base offense level is 30 and that, with a criminal history category of I, the calculation

produces a guidelines range of 97 to 121 months.  See June 2nd Tr. at 115:10-19 (Court, Winder, Long).  The Court then considered G. Roybal's request for a downward variance to a term of 37-months imprisonment, which the Court ultimately denied.  See June 2nd Tr. at 152:24-169:8 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section

> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v.

United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91

(2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any

presumption in favor of the Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall

v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given
> the sentencing court discretion that it did not have earlier, the sentencing court's
> first task remains to accurately and correctly determine the advisory-guideline
> sentence.  Thus, before the sentencing court takes up a defendant's Booker
> arguments, the sentencing court must first determine whether the defendant is
> entitled to downward departures.  The sentencing court may, however, also use
> these same departure factors in the Booker calculus, even if the court does not
> grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is

"in a superior position to find facts and judge their import under § 3553(a) in each particular

case."  Kimbrough v. United States, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has

found that the case of an illegal immigrant who re-enters the United States to provide for his two

children and two siblings was not materially differentiated from other re-entry cases, and, thus,

no variance from the Guidelines sentence was warranted.  See United States v. Alemendares-

Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec.14, 2010)(Browning, J.).  On

the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb.

17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual

degree and, thus, did not warrant a departure, the Court found that a variance was appropriate,

because the defendant's military service was "superior and uniformly outstanding," as the

defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."

2011 WL 831279, at *14.

**LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS**
**UNDER THE GUIDELINES**

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and that the Sixth Amendment to the Constitution of the United States requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303 (emphasis omitted)(citations omitted)(internal quotation marks omitted). In United States v. Booker, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "Apprendi does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of Apprendi's requirement." (alterations omitted)(internal quotations marks omitted)). The Supreme Court has recently held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85.  United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine.  See 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months to 121 to 151 months.  See United States v. Magallanez, 408 F.3d at 682-83.  The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United

States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11

F.3d 1510, 1516 (10th Cir. 1993)).[28]   "[T]he application of an enhancement . . . does not

implicate the Supreme Court's holding in Apprendi v. New Jersey."   United States v. Reyes-

Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.).

The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a

jury only where the fact would increase a defendant's sentence "above the statutory maximum

permitted by the statute of conviction."   United States v. Price, 400 F.3d 844, 847 (10th Cir.

2005).   Accord United States v. Ray, 704 F.3d at 1314.   A defendant may assert an error under

Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory

maximum.   See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that

a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does

---

[28]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).   See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).   The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.   United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation).   See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

not exceed the statutory maximum"); United States v. Hendrickson, No. 12-5016, 2014 WL 6679446, at *6 (10th Cir. Nov. 25, 2014)(unpublished)[29](holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").  As the Court has noted:

> The Court explained that, although the decision of the Supreme Court of the United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a

---

[29]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Hendrickson, United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009), United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), and United States v. Lizardo-Figueroa, 277 F. App'x 778 (10th Cir. 2008) all have persuasive value with respect to a material issue, and will assist the Court in its disposition of this MOO.

different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt.

1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3(a) provides that the base offense level under the guidelines "shall be

determined" based on the following:

> (1)   (A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
>        (B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)   solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)   all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)   any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States and a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base

offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments, which the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States provides.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including the Tenth Circuit's, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts

had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  See 519 U.S. at 149.  In reaching its result, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  United States v. Watts, 519 U.S. at 151 (quoting 18 U.S.C. § 3661).  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add

at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) individuals at the arrest scene handled the weapons at will; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison.  See 11 F.3d at 1515.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not

require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing <u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 84 (1986)).  <u>See United States v. Sangiovanni</u>, No. CR 10-3239 JB, 2014 WL 4347131, at *22-26 (D.N.M. Aug. 29, 2014)(Browning, J.)(ruling that a sentencing court can cross reference from the guidelines that correspond to the defendant's crime of conviction to the guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); <u>United States v. Cervantes-Chavez</u>, No. CR 14-0259, 2014 WL 6065657, at *14-15 (D.N.M. Nov. 3, 2014)(Browning, J.)(cross referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court has previously held that it may consider a defendant's refusal to answer questions for the PSR, while not drawing an adverse inference from the refusal.  <u>See United States v. Goree</u>, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.).  The Court has also determined that, although it could consider the defendant's silence about information regarding herself or others engaging in criminal conduct, it would not rely on that silence to increase the defendant's sentence.  <u>See United States v. Chapma</u>n, No. CR 11-0904 JB, 2012 WL 257814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.).  Finally, the Court has concluded that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence.  <u>United States v. Romero</u>, No. CR 09-1253 JB, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

<u>ANALYSIS</u>

The Court will sustain the parties' objections in part and overrule them in part.  The Court will not impose a 2-level enhancement under § 2D1.1(b)(1), because G. Roybal has demonstrated that it was clearly improbable that the guns discovered at his house were used in connection with drug-trafficking offenses by showing that he used those guns for hunting.  The Court will impose a 2-level enhancement under § 2D1.1(b)(12), because the United States has shown by a preponderance of the evidence that distributing illegal drugs was one of G. Roybal's primary uses for his residence.  The Court will impose a 2-level adjustment under § 3C1.1, because G. Roybal willfully instructed and impeded the administration of justice when he threatened a confidential informant and his or her family.  The Court will increase G. Roybal's base offense level from 24 to 26, because the United States has shown by a preponderance of the evidence that G. Roybal was involved in trafficking two kilograms of cocaine on April 10, 2012.  The Court will not grant G. Roybal a mitigating role adjustment under § 3B1.2, because there is no sound evidence that he is less culpable than the average participant in the C. Roybal DTO.  Finally, the Court will deny G. Roybal's request for a downward variance from the advisory sentencing guideline range in light of the § 3553(a) factors.

**I.      THE COURT WILL NOT IMPOSE A 2-LEVEL ADJUSTMENT UNDER § 2D1.1(b)(1), BECAUSE G. ROYBAL DID NOT POSSESS A DANGEROUS <u>WEAPON IN CONNECTION WITH A DRUG-TRAFFICKING OFFENSE.</u>**

Section 2D1.1(b)(1) provides for a 2-level enhancement for the possession of a dangerous weapon in connection with a drug-trafficking offense.  <u>See</u> U.S.S.G. § 2D.1.1(b)(1).  "The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons."  U.S.S.S. § 2D1.1, cmt. 11(A).  The Tenth Circuit has "frequently noted that firearms are 'tools of the trade' for drug traffickers."  <u>United</u>

States v. Lizardo-Figueroa, 277 F. App'x 778, 781 (10th Cir. 2008)(unpublished)(quoting United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991)).  The United States bears the initial burden of proving the enhancement applies, and can meet its burden by showing "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." United States v. Zavalza-Rodriguez, 379 F.3d 1182, 1185 (10th Cir. 2004)(citation omitted)(internal quotation marks omitted).  The United States can also meet its burden by showing "that a weapon was located near the general location where at least part of a drug transaction occurred."  United States v. Vaziri, 164 F.3d 556, 568 (10th Cir. 1999).

The United States has met its initial burden under § 2D1.1(b)(1).  A search of G. Roybal's home uncovered five guns.  In the dining room, federal agents discovered a Savage Rifle Model 64 22LR that was wrapped in a box and appeared to be new.  Under Roybal's bed, federal agents discovered: (i) a New England Padner Model 20-gauge shotgun; (ii) a .308 Remington 700 rifle with a scope; and (iii) a .243 Remington 7400 rifle with a scope and magazine.  See PSR ¶ 29, at 14.  In G. Roybal's bedroom closet, agents discovered a Weatherby Ninety Two 12-gauge shotgun.  See PSR ¶ 29, at 14.

The guns were found in G. Roybal's house during a time period in which he was engaged in a narcotics conspiracy with the C. Roybal DTO.  See PSR ¶ 23, at 13 ("According to the case agent, G. Roybal was very involved in the DTO as he stored money and drugs at his residence for C. Roybal."); id. ¶ 31, at 14 ("G. Roybal will be held accountable for the three drug transactions wherein he was involved in distributing marijuana and cocaine.  The total amount of drugs after the two substances have been converted to their marijuana equivalency totals 400.32 kilograms.").  Furthermore, the house in which the guns were discovered has several connections to that drug conspiracy.  See PSR ¶ 28, at 14 ("CHS provided information that he had been to G.

Roybal's residence . . . in 2011 and 2012.  He described one occasion in 2011 where he observed a large trash bag overflowing with one pound packages of marijuana and a backpack with cocaine."); id. ¶ 28, at 14 (explaining an incident during which C. Roybal and G. Roybal "retrieved a large sum of cash from one of the back rooms" of G. Roybal's residence and divided the money between Chase Cameron, C. Roybal, and himself to "get past [airport] security without being questioned regarding the origin of the money").  These connections can establish that G. Roybal possessed the guns during the course of the conspiracy.  See United States v. Flores, 149 F.3d 1272, 1280 (10th Cir. 1998)(holding that the enhancement was proper where "the weapon was located nearby the general location where drugs or drug paraphernalia are stored or where part of the transaction occurred").  In addition to the five guns, the federal agents who searched G. Roybal's house discovered six cellular telephones and a digital scale.  This evidence tends to link the guns to drug trafficking.  See United States v. Hall, 473 F.3d 1295, 1312 (10th Cir. 2007)(upholding enhancement where an unloaded shotgun was found "in a car sitting right outside [defendant's] residence and easily accessible through the top of the vehicle . . . [and] other drug paraphernalia was found at the house, including scales with cocaine residue on them").  Accordingly, the United States has met its initial burden of showing by a preponderance of the evidence "that a weapon was located near the general location where at least part of a drug transaction occurred."  United States v. Vaziri, 164 F.3d at 568.

Although the United States met its initial burden, the Court will not apply a 2-level enhancement under § 2D1.1(b)(1), because G. Roybal has shown that it is clearly improbable that the guns in his house were connected with the drug-trafficking offenses.  "If the government meets its initial burden, the defendant must demonstrate that it is clearly improbable that the weapon was connected with the offense."  United States v. Foy, 641 F.3d 455, 470 (10th Cir.

2011).   The United States Sentencing Commission's commentary to § 2D1.1(b)(1) and three

cases -- one from the United States Court of Appeals for the Sixth Circuit and two from the

Tenth Circuit -- demonstrate that the clearly improbable burden is not easily met.   Application

Note 11(A) provides an example of a situation in which the defendant can demonstrate that it is

clearly improbable that possession of a firearm is connected to a drug trafficking offense.   It

states: "[T]he enhancement would not be applied if the defendant, arrested at the defendant's

residence, had an unloaded hunting rifle in the closet."   U.S.S.G. § 2D1.1, n.11(A).

The Sixth Circuit's opinion in United States v. Zimmer, 14 F.3d 286 (6th Cir. 1994),

provides a good illustration of this example.   In United States v. Zimmer, the Sixth Circuit

determined that the district court's application of § 2D 1.1(b)(1)'s enhancement was clear error,

concluding that the defendant met his burden by "show[ing] by unrefuted testimony that the[]

rifles were for hunting and were unconnected with the marijuana."   14 F.3d at 290.   The Sixth

Circuit noted that the defendant was convicted for "a marijuana *manufacturing* operation" and

that "[t]here are no allegations that Zimmer was actively selling the substance . . . ."   14 F.3d at

291 (emphasis in original).   Regarding the weapons for which the enhancement was applied, the

Sixth Circuit explained:

> The rifles were found in the main part of the house while the plants were grown in
> a "secret room" in the basement.   No weapons were found in the basement where
> the marijuana plants were located.   Two rifles (one operable but unloaded, one
> disassembled and inoperable) were in the living room while one rifle was found
> loaded in the bathroom.   Zimmer stated that only the rifle in the bathroom
> belonged to him and that he used it to hunt, which was clearly supported by the
> fact that Zimmer had killed a deer from the bathroom window on the day before
> the search (he was fined for illegal possession of the deer).

United States v. Zimmer, 14 F.3d at 291.   The Sixth Circuit concluded that Zimmer's assertions

about all three of his rifles being unconnected with his marijuana manufacturing were supported

by substantial evidence:

- 63 -

> That one of the rifles in the living room was disassembled and inoperable supports the defendant's claim that he was repairing it for a friend. Likewise, the absence of any ammunition in the house for the unloaded second rifle further supports the defendant's assertion that the rifle did not belong to him.
>
> As for the loaded rifle, Zimmer's claim that he used it for hunting purposes was factually corroborated. Zimmer argued that he hunted from the window of his bathroom which faced the back of his yard. At least one deer found on the premises had been shot from the window the day before. This testimony was unrebutted by the government. Moreover, the bathroom was in the main part of the house and not near the basement where the marijuana was located.

14 F.3d at 291.

In United States v. Krolopp, 427 F. App'x 639 (10th Cir. 2011)(unpublished), on the other hand, the Tenth Circuit concluded that the defendant failed to show that it was clearly improbable that his possession of a "100 year[] old" shotgun was connected to a drug offense. 427 F. App'x at 643. The Tenth Circuit rejected the defendant's argument that he kept the shotgun as a collector's item, because the shotgun was functional, had its stock wrapped in electrical tape, "suggest[ing] a utilitarian rather than a decorative function, and it had little value as a collector's item," and was Velcroed behind a picture above the defendant's bed. 427 F. App'x at 643. The Tenth Circuit also rejected the defendant's argument that the lack of ammunition showed that it was clearly improbable that it was connected to the drug trafficking, stating that "[t]his factor is not determinative." 427 F. App'x at 643.

The Tenth Circuit reached a similar conclusion in United States v. Hall, 473 F.3d at 1312. In that case, the Tenth Circuit concluded that § 2D1.1(b)(1) applied where an unloaded shotgun was discovered in a car sitting outside the defendant's home and "other drug paraphernalia was found at the house, including scales with cocaine residue on them." 473 F.3d at 1312. The Tenth Circuit noted:

> Though the shotgun was found in an abandoned car, the gun itself was oiled, cleaned, and spotless. It was sitting on top of other items in the car and it was

easily accessible to Mr. Hall because the car, a T-top, was right outside the backdoor and one could grab the gun simply by reaching down through the roof of the car. Furthermore, the video surveillance and wiretaps revealed that Mr. Hall frequently returned to his residence immediately after negotiating drug transactions over the phone with Mr. Small. The Government also pointed out that in addition to the weapons-related evidence, the police recovered other "tools of the trade" in their search -- namely, $2,700 in cash and two scales that were found to have residue of cocaine on them.

473 F.3d at 1304.

The Court can distill three general principles from these three cases. First, courts are more inclined to apply § 2D1.1(b)(1) when the defendant has been discovered with a gun that can effectively be used at short range -- like a handgun or a shotgun -- than a rifle, which is more difficult to use effectively at short range and is also more difficult to conceal. Second, courts are more likely to apply § 2D1.1(b)(1) when there is no independent evidence corroborating the defendant's alternative, lawful explanation for owning the gun. Unlike in United States v. Zimmer, where the fact that the defendant had killed a deer from the bathroom window on the day before the search supported his explanation that he used his rifles for hunting, in United States v. Krolopp, the shotgun's accessibility, its lack of value, and that its stock was wrapped with electrical tape undermined the defendant's explanation that the firearm was a collectible. Third, while it may be relevant that a gun is unloaded and that the defendant did not possess any ammunition, those factors are not dispositive. Although Krolopp and Hall were both discovered with unloaded weapons, and Hall was discovered without any ammunition whatsoever, the Tenth Circuit applied § 2D1.1(b)(1) in both of their cases.

Applying these principles to this case, the Court concludes that G. Roybal has presented sufficient evidence to corroborate his assertion that he used the two shotguns discovered in his home for hunting. The Court agrees with the United States and G. Roybal that the Savage Rifle Model 64 22LR, which was found wrapped in a box in G. Roybal's living room, appears to be a

- 65 -

gift to his daughter.  The Court also agrees that the two rifles discovered in G. Roybal's home --

the 308 Remington 700 rifle with scope and 243 Remington 7400 rifle with scope -- appear to be

used for hunting.  The Court finds it hard to conclude that G. Roybal used his hunting rifles, fully

equipped with scopes, to assist him in drug trafficking.

G. Roybal also presented sufficient evidence at his evidentiary sentencing hearings to

establish that he used his 20-gauge and 12-gauge shotguns for hunting.  J. Roybal identified the

12-gauge shotgun in a photograph, and testified that he and his father used it to hunt snow geese.

See Tr. at 6:21-7:6 (J. Roybal, Winder).  J. Roybal also identified the 20-gauge shotgun in a

photograph and testified that his parents got it for him as a present for his eighth birthday, and

that he used it to hunt small birds like dove and quail.  See Tr. at 7:13-18 (J. Roybal, Winder).

Given this evidence, G. Roybal's case is closer to United States v. Zimmer -- in which the

defendant presented independent evidence to corroborate his argument that he used the guns

discovered in his house solely for hunting -- than United States v. Hall or United States v.

Krolopp, where the defendants had no such evidence.  Accordingly, the Court will sustain G.

Roybal's objection to paragraph 43 of the PSR and will not impose a 2-level adjustment under

§2D1.1(b).

## II.  THE COURT WILL IMPOSE A 2-LEVEL ADJUSTMENT UNDER § 2D1.1(b)(12), BECAUSE G. ROYBAL MAINTAINED HIS HOUSE FOR THE PURPOSE OF DISTRIBUTING A CONTROLLED SUBSTANCE.

Section 2D1.1(b)(12) directs a sentencing court to increase the offense level by 2 levels

"[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a

controlled substance."  U.S.S.G. § 2D1.1(b)(12).  Application Note 17 to § 2D1.1(b)(12)

explains that "[m]anufacturing or distributing a controlled substance need not be the sole purpose

for which the premises was maintained, but must be one of the defendant's primary or principal

uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." U.S.S.G. § 2D1.1, Application Note 17.  Courts applying the above-quoted language "should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." U.S.S.G. § 2D1.1, Application Note 17.

The United States contends that, because the 605 Parkside Place SE was G. Roybal's and his family's principal residence, § 2D1.1(b)(12) does not apply.  The United States Court of Appeals for the Eighth Circuit rejected that argument in United States v. Miller, 698 F.3d 699 (8th Cir. 2012).  In an opinion that the Honorable James B. Loken, United States Circuit Judge for the Eighth Circuit, authored, and Judges Gruender and Benton joined, the Eighth Circuit first noted that, in passing 21 U.S.C. § 856 in 2010, Congress directed the Sentencing Commission to enact § 2D1.1(b)(12).  See 698 F.3d at 705.  The Eighth Circuit said that it was "baffled" by Application Note 17's instruction to compare the frequency of lawful and unlawful uses in determining whether to apply § 2D1.1(b)(12).  The Eighth Circuit noted:

> When the premises in question was the defendant's family home, by definition it was used for that lawful purpose 100% of the time.  Yet Congress in enacting § 856 and in directing the Commission to adopt § 2D1.1(b)(12) surely intended to deter the manufacture and distribution of illegal drugs in "crack houses" where children are being raised.

United States v. Miller, 698 F.3d at 705.  Accordingly, the Eighth Circuit concluded that § 2D1.1(b)(12) applies "when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question." 698 F.3d at 707.

The Tenth Circuit has not addressed the issue, but the Fourth, Sixth, Seventh, and Eleventh Circuits have all found that § 2D1.1(b)(12) can apply to a defendant's, and his or her

family's, primary residence.  See United States v. Cintora-Gonzalez, 569 F. App'x 849, 854-55 (11th Cir. 2014)(unpublished); United States v. Haines, 582 F. App'x 237, 238 (4th Cir. 2014)(unpublished); United States v. Flores-Olague, 717 F.3d 526, 531 (7th Cir. 2013); United States v. Johnson, 737 F.3d 444, 447-48 (6th Cir. 2013).  No circuit has criticized this approach. The Court agrees with the Eighth Circuit that Congress intended § 2D1.1(b)(12) "to deter the manufacture and distribution of illegal drugs in 'crack houses' where children are being raised." United States v. Miller, 698 F.3d at 705.  Accordingly, that G. Roybal and his family used 605 Parkside Place SE as their primary residence does not preclude the application of § 2D1.1(b)(12). In United States v. Johnson, the Sixth Circuit looked to a number of factors to determine whether § 2D1.1(b)(12) applies: (i) tools of the trade -- e.g., laboratory equipment, scales, guns, and ammunition; (ii) large quantities of cash; and (iii) multiple employees or customers of the illegal drug trade coming in and out of the residence.  See 737 F.3d at 447-48.

Applying those factors here, the Court concludes that a 2-level adjustment under § 2D1.1(b)(12) is warranted.  The PSR identifies three significant events during which G. Roybal's residence was connected to the C. Roybal DTO: (i) on March 16, 2012, Granado dropped off money at G. Roybal's residence that he owed C. Roybal for a prior illegal drug transaction, see Excerpt of Search Warrant Affidavit ¶ 79, at 47-49; (ii) on April 11, 2012, C. Roybal and G. Roybal retrieved $31,500.00 from a bedroom in G. Roybal's house for C. Roybal to give to Cameron as partial payment toward a $50,000.00 debt for high-grade marijuana, see PSR ¶ 28 at 14; and (iii) CHS-1 described one occasion during which he observed a large trash bag overflowing with one-pound packages of marijuana and a backpack with five kilograms of cocaine in G. Roybal's kitchen, see PSR ¶ 26, at 13.  In addition to these incidents, a search of G. Roybal's residence uncovered a number of "tools of the trade": six cellular telephones and a

digital scale.  See PSR ¶ 29, at 14.  Federal agents also recovered three rifles and two shotguns.

See PSR ¶ 29, at 14.  While other cases have found guns to be a relevant factor § 2D1.1(b)(12),

the Court has concluded that G. Roybal used his firearms solely for hunting, and not for drug

trafficking.    The Court will therefore not count the firearms against G. Roybal under

§ 2D1.1(b)(12).  Moreover, although federal agents did not find illegal drugs or cash during their

search of G. Roybal's residence, it is sufficient that -- through confidential informants and

surveillance -- the United States learned of multiple drug transactions that occurred at G.

Roybal's residence.  The cellular telephones, the digital scale, and that G. Roybal and C. Roybal

kept a large quantity of money and drugs at G. Roybal's house on previous occasions makes it

more likely than not that G. Roybal "maintained [the] premises for the purpose of . . .

distributing a controlled substance."   U.S.S.G. § 2D1.1(b)(12).   Accordingly, the Court will

overrule G. Roybal's objection to paragraph 44 of the PSR and will impose a 2-level adjustment

under § 2D1.1(b)(12).


### III.   THE COURT WILL IMPOSE A 2-LEVEL ADJUSTMENT UNDER § 3C1.1, BECAUSE G. ROYBAL WILLFULLY OBSTRUCTED OR IMPEDED THE ADMINISTRATION OF JUSTICE BY THREATENING A CONFIDENTIAL INFORMANT.

The Court will overrule G. Roybal's objection to paragraph 48 of the PSR.  A 2-level

enhancement is warranted under § 3C1.1 if "the defendant willfully obstructed or impeded,

or attempted to obstruct or impede, the administration of justice during the investigation,

prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. § 3C1.1.  One of the

examples of conduct to which the obstruction enhancement applies is "threatening, intimidating,

or otherwise unlawfully influencing a . . . witness, . . . , directly or indirectly, or attempting to do

so." U.S.S.G. § 3C1.1, Application Note 4(A). Application Note 7 to § 3C1.1, however, provides:

> _Inapplicability of Adjustment in Certain Circumstances._ – _If the defendant is convicted of an offense covered by §2J1.1 (Contempt), §2J1.2 (Obstruction of Justice) . . . this application is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense)._

U.S.S.G. § 3C1.1, Application Note 7. Here, G. Roybal correctly points out in the "Recommendations" section of G. Roybal's Plea Agreement, it states that "[p]ursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend [that] USSG § 2J1.2, Obstruction of Justice, is the sentencing guideline that should apply to Count 61, Tampering with a Witness." Plea Agreement at 5. G. Roybal contends that because the parties agreed that § 2J1.2 would be the applicable sentencing guideline, application note 7 to § 3C1.1 precludes application of the 2-point enhancement under § 3C1.1. See Objections at 9. G. Roybal explains,

> [i]n the plea agreement, the parties agreed that "USSG § 2J1.2, Obstruction of Justice, is the sentencing guideline that should apply to Count 61, Tampering with a Witness." The application note to U.S.S.G. § 3C1.1 sets forth the following: "If the defendant is convicted of an offense covered by . . . § 2J1.2, Obstruction of Justice . . . this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense.). In this case, Mr. Roybal did not threaten any witness during the course of the prosecution for the obstruction offense.

Objections at 9 (emphasis in original).

The Court disagrees with G. Roybal's analysis. Here, G. Roybal pled guilty to two counts: one count of Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. § 846 (Count 1), and one count of Witness Tampering, in violation of 18 U.S.C. § 1512(a)(2)(A) (Count 61). See Plea Agreement ¶ 3, at 2. Counts 1 and 61 were then grouped for guideline calculation purposes

under § 3D1.2(c).  See PSR ¶ 41, at 17; June 2nd Tr. at 28:13-29:23 (Court, Probation Officer, Long).  The parties failed to point out that application note 8 to § 3C1.1 addresses precisely this situation:

> *Grouping Under §3D1.2(c).* – *If the defendant is convicted both of an obstruction offense (e.g., 18 U.S.C. § 3146 (penalty for failure to appear); 18 U.S.C. § 1621 (Perjury generally)) and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of §3D1.2 (Groups of Closely Related Counts).  The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.*

U.S.S.G. § 3C1.1, Application Note 8.  Here, G. Roybal was convicted both of an obstruction offense -- Witness Tampering, in violation of 18 U.S.C. § 1512(a)(2)(A) (Count 61) -- and an underlying offense -- Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. § 846 (Count 1), with respect to which the obstructive conduct occurred.  Pursuant to application note 8 of § 3C1.1, therefore, Count 1 and 61 are grouped under § 3D1.2(c), and the "offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater."  U.S.S.G. § 3C1.1, Application Note 8.  Because the offense level for Count 1, 21 U.S.C. § 846 -- the underlying offense -- "increased by the 2-level adjustment specified by [§ 3C1.1]," is greater than the offense level for Count 61, 18 U.S.C. § 1512(a)(2)(A) -- the obstruction offense -- the application of a 2-level enhancement under § 3C1.1 is permissible in this case.

The only remaining question thus is whether G. Roybal "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. § 3C1.1.  One of the

examples of conduct to which the obstruction enhancement applies is "threatening, intimidating, or otherwise unlawfully influencing a . . . witness, . . . , directly or indirectly, or attempting to do so."  U.S.S.G. § 3C1.1, Application Note 4(A).  The Court made the following findings, set forth in this MOO's factual findings section, regarding G. Roybal's threats against CHS-1:

1.     After G. Roybal's arrest in December 2012, he was released on conditions of supervision pending resolution of the federal charges against him.  See PSR ¶ 32, at 15; Plea Agreement ¶ 12, at 4-5.

2.     At that time, G. Roybal learned that CHS-1, to whom C. Roybal and G. Roybal had distributed cocaine, was working at the direction of the FBI.  See Plea Agreement ¶ 12, at 4-5.

3.     On or about November 13, 2013, G. Roybal approached CHS-2 at CHS-2's workplace, Adelante Trucking, located in Albuquerque.  See PSR ¶ 32, at 15; Response at 16; Plea Agreement ¶ 12, at 4-5; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

4.     G. Roybal indicated to CHS-2 that G. Roybal knew CHS-1 was related to CHS-2. See PSR ¶ 32, at 15; Response at 16; Plea Agreement ¶ 12, at 5; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

5.     G. Roybal told CHS-2 that he knew about CHS-1's medical condition and that CHS-1 was going to end up in a wheel chair for what CHS-1 had done.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

6.     G. Roybal also stated that he and his people had been watching CHS-1's residence, and that they knew when the children came home.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

7.      G. Roybal added that he and his people were going to hit CHS-1 where it hurts the most, and make CHS-1's family pay.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

8.      G. Roybal further stated to CHS-2 that if CHS-1 went to Las Vegas, New Mexico, CHS-1 and CHS-1's family would be in grave danger.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

9.      CHS-2 told G. Roybal that CHS-1 babysits CHS-2's child on a regular basis and that CHS-2 did not want the child to be hurt.  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

10.     G. Roybal responded to CHS-2: "oh well, you know how it is."  See PSR ¶ 32, at 15; Response at 16; May 27th Tr. at 80:10-81:15 (Long, Nelson); Jan. 30th FBI Report at 1.

G. Roybal's statements are sufficient to establish that he "threaten[ed], intimidate[ed], or otherwise unlawfully influenc[ed] a . . . witness, . . . , directly or indirectly, or attempt[ed] to do so."  U.S.S.G. § 3C1.1, Application Note 4(A).  See United States v. Thomas, 547 F. App'x 612, 613 (5th Cir. 2013)(unpublished)("The district court also properly increased Thomas's sentence based on a finding that he obstructed justice by threatening potential witnesses and their child."); United States v. Walker, 392 F. App'x 919, 933 (3d Cir. 2010)(unpublished)(applying § 3C1.1 adjustment where defendant threatened to kill members of a witness's family after the first day of the witness's testimony); United States v. Discua, 189 F. App'x 202, 207 (4th Cir. 2006)(unpublished)("[T]he sentencing court did not clearly err in interpreting as a threat Discua's statement that his family knew where the witnesses' families lived.  Although the threat was implied rather than express, a less subtle implicit threat would be difficult to imagine.").  Cf. United States v. Wahlstrom, 588 F.3d 538, 544 (8th Cir. 2009)(applying § 3C1.1 adjustment

where defendant attempted to harm a prosecutor's wife).  Accordingly, the Court will overrule

G. Roybal's objection to paragraph 48 of the PSR.

## IV.    THE COURT WILL INCREASE G. ROYBAL'S BASE OFFENSE LEVEL FROM 24 TO 26.

G. Roybal objects to the increase in the base offense level from 24 to 26 on the grounds

that it is based on insufficiently reliable evidence.  The United States has the burden of proving

the quantity of drugs for sentencing purposes by a preponderance of the evidence.  See United

States v. Reyes, 979 F.2d 1406, 1410 (10th Cir. 1992).  The district court must consider "all

quantities of contraband with which he was directly involved, and . . . all reasonably foreseeable

quantities . . . that were within the scope of the criminal activity that he jointly undertook."

U.S.S.G. § 1B1.3, Application Note 2.

The Court can "rely on a government estimate" of a drug quantity to determine the base

offense level.  United States v. Ortiz, 993 F.3d 204, 297 (10th Cir. 1993).  The information

underlying the estimate must possess "sufficient indicia of reliability to support its probable

accuracy." U.S.S.G. § 6A1.3.  The Commentary to § 6A1.3 advises: "Out-of-court declarations

by an unidentified informant may be considered where there is good cause for the non-disclosure

of the informant's identity and there is sufficient corroboration by other means."  U.S.S.G. §

6A1.3, Commentary.

Here, the United States has corroborated its confidential source's statements about the

April 10, 2012, and April 11, 2012, drug transactions involving G. Roybal.  With respect to the

April 10, 2012, transaction, the United States has presented intercepted wire communications to

corroborate the source's description of the transaction.  With respect to the April 11, 2012,

transaction, the United States has surveillance footage and agent surveillance that corroborate the

confidential source's description of the transaction that day.  Accordingly, the United States has

- 74 -

sufficiently established that G. Roybal was involved with trafficking two kilograms of cocaine

for G. Roybal's base offense level to be 26 rather than 24.

## V.   THE COURT WILL OVERRULE G. ROYBAL'S REQUEST FOR A 4-LEVEL REDUCTION FROM A BASE LEVEL OF 24 TO 20 UNDER § 3B1.2(a).

The Court will not grant a mitigating role adjustment.  Section 3B1.2[30] "provides a range

of adjustments for a defendant who plays a part in committing the offense that makes him

---

[30]On April 9, 2015, the United States Sentencing Commission (the "Commission") voted to promulgate amendments to some portions of the United States Sentencing Guidelines ("U.S.S.G.").  See NATIONAL SENTENCING RESOURCE COUNSEL PROJECT, FEDERAL PUBLIC & COMMUNITY DEFENDERS, SUMMARY OF 2015 PROPOSED AMENDMENTS TO THE SENTENCING GUIDELINES 1 (2015), *available at* https://goo.gl/8BjPUi.  The Commission submitted the amendments to Congress on April 30, 2015 pursuant to its authority under 28 U.S.C. § 994(p). The amendments went into effect on November 1, 2015, after the Court sentenced G. Roybal. The Commission made some several changes to § 3B1.2.

First, the Commission addressed a circuit split on the meaning of "average participant," adopting the approach of the United States Court of Appeals for the Seventh Circuit and the United States Court of Appeals for the Ninth Circuit, which define "average participant" as those persons who actually participated in the criminal activity at issue in the defendant's case, so that the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand.  See, e.g., United States v. Benitez, 34 F.3d 1489, 1498 (9th Cir. 1994); United States v. DePriest, 6 F.3d 1201, 1214 (7th Cir. 1993).  The Commission rejected the approach of the United States Court of Appeals for the First Circuit and the United States Court of Appeals for the Second Circuit, which have concluded that the "average participant" also includes "the universe of persons participating in similar crimes."  See United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004); see also United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999).  "Under this latter approach, courts w[ould] usually consider the defendant's culpability relative both to his co-participants and to the typical offender."  UNITED STATES SENTENCING COMMISSION, AMENDMENTS TO THE SENTENCING GUIDELINES 45 (2015).  The amendment revises the commentary to specify that, when determining the mitigating role, the defendant is to be compared with the other participants "in the criminal activity."  See U.S.S.G. § 3B1.2, cmt. 3(A) ("This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity.").

Second, the amendment provides a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment under § 3B1.2 and, if so, the amount of the adjustment.  See UNITED STATES SENTENCING COMMISSION, AMENDMENTS TO THE SENTENCING GUIDELINES 46 (2015).  Commentary note 3(C) now states:

> *Fact-Based Determination.* – *The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the*

substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Application Note 3(a).  Subsection (b) covers a defendant who "is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, Application Note 5.  The Tenth Circuit has held that the inquiry whether a defendant is a minor or minimal participant must "focus upon the defendant's knowledge or lack thereof concerning the scope and structure of the enterprise and of the activities of others involved in the offense."  United States v. Salazar-

---

*circumstances and involves a determination that is heavily dependent upon the facts of the particular case.*

*In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:*

*(i)     the degree to which the defendant understood the scope and structure of the criminal activity;*

*(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;*

*(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;*

*(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts of the defendant performed and the responsibility and discretion the defendant had in performing those acts;*

*(v)     the degree to which the defendant stood to benefit from the criminal activity.*

U.S.S.G. § 3B1.2, cmt. 3(C).

  Third, the commentary now states that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline" and "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative."  U.S.S.G. § 3B1.2, cmt. 3(C).  Finally, "the commentary discussing individuals who perform limited functions has been changed to state that they 'may receive' a mitigating role adjustment rather than that they 'are not precluded' from receiving an adjustment."  See NATIONAL SENTENCING RESOURCE COUNSEL PROJECT, FEDERAL PUBLIC & COMMUNITY DEFENDERS, SUMMARY OF 2015 PROPOSED AMENDMENTS TO  THE SENTENCING GUIDELINES 2 (2015), *available at* https://goo.gl/8BjPUi. (discussing U.S.S.G. § 3B1.2, cmt. 3(A)).

Samaniega, 361 F.3d 1271, 1277 (10th Cir. 2004).  To receive the adjustment, the defendant has "the burden to prove by a preponderance of the evidence" that he was "less culpable than most other participants."  United States v. Ballard, 16 F.3d 1110, 1114-15 (10th Cir. 1994).

The Tenth Circuit has looked to a defendant's knowledge in determining whether a minor- or minimal-role adjustment applies.  See, e.g., United States v. Adams, 751 F.3d 1175, 1180 (10th Cir. 2014)(finding the defendant's "knowledge of the scheme" to rob a bank relevant to the determination that he was not a minor participant); United States v. Lockhart, 37 F.3d 1451, 1455 (10th Cir. 1994)(noting that the PSR revealed that the defendant had "knowledge or understanding" of the drug enterprise, and that he was thus "not a minimal or *minor* participant" (internal quotation marks omitted)(emphasis in original)).

In United States v. Aguirre-Garcia, No. CR 08-0823 JB, 2009 WL 5851092, (D.N.M. Dec. 15, 2009)(Browning, J.), the Court found that a defendant was not entitled to a mitigating role adjustment, because the defendant, with two co-defendants knowingly transported cocaine out of state on two occasions.  See 2009 WL 5851092, at *1-3.  Because Aguirre-Garcia had the same knowledge and took the same actions as his co-defendants, in driving a car which the defendants knew contained cocaine out of state, the Court found that Aguirre-Garcia was not entitled to a mitigated role adjustment, even though he had purportedly informed his co-defendants that he did not want to transport drugs and was only along for the ride.  See 2009 WL 5851092, at *1-3.  On the other hand, where a defendant charged for conspiring to distribute methamphetamine possessed only seven grams out of the 400 grams involved in the conspiracy, and no other evidence supported the defendant being more than a "user," the Court granted a minor role adjustment, because a preponderance of the evidence did not support that the

defendant was a "dealer," as were his co-defendants in the conspiracy.  United States v. Justice,

No. CR 09-3078 JB, 2012 WL 394455, at *1-5, 9-10 (D.N.M. Jan. 23, 2012)(Browning, J.).

The Tenth Circuit's ruling in United States v. Ayers, 84 F.3d 382, 384 (10th Cir. 1996), is

also instructive.  In that case, the PSR noted that, several weeks before his arrest, the defendant

> rented an apartment in Albuquerque, New Mexico and that a Mr. Paul Markland
> helped him pay for it. . . .  Mr. Ayers knew that Mr. Markland was selling cocaine
> and using the apartment to prepare and store crack cocaine, contact potential
> buyers, and store money. . . .  Mr. Ayers acknowledged "that he had sometimes
> traveled with Markland to pick up money, and had sold cocaine for Markland on
> occasion over a period of several months."  At the time of his arrest, police
> discovered 90.8 grams of crack cocaine, .4 grams of powdered cocaine, and 3
> grams of marijuana in Mr. Ayers's apartment.

84 F.3d at 384.

The Tenth Circuit acknowledged that there was no indication that the defendant arranged

drug sales or made drug deliveries when he leased the apartment, but upheld the district court's

refusal to grant a mitigating role adjustment.  The Tenth Circuit reasoned that

> Mr. Ayers's admitted knowledge of Mr. Markland's drug dealing, his
> accompanying Mr. Markland in the collection of debts, and his allowing Mr.
> Markland to use the apartment are all factors supporting the inference that Mr.
> Ayers knowingly permitted Mr. Markland to use the apartment to sell drugs.  It
> was therefore not clearly erroneous for the district court to find that . . . Mr. Ayers
> served an important function in [a] drug distribution network, such that he was not
> entitled to an offense level reduction under U.S.S.G. 3B1.2.

United States v. Ayers, 84 F.3d at 384.

G. Roybal was at least as involved in the C. Roybal DTO as Ayers was in Markland's

drug-trafficking operations.  The PSR identifies three significant events during which G. Roybal

was connected with the C. Roybal DTO: (i) on March 16, 2012, Granado dropped off money at

G. Roybal's residence that he owed C. Roybal for a prior illegal-drug transaction, see Excerpt of

Search Warrant Affidavit  ¶ 79, at 47-49; (ii) on April 11, 2012, C. Roybal and G. Roybal

retrieved $31,500.00 from a bedroom in G. Roybal's house for C. Roybal to give to Cameron as

partial payment toward a $50,000.00 debt for high-grade marijuana, see PSR ¶ 28 at 14; and (iii) CHS-1 described one occasion during which he observed a large trash bag overflowing with one-pound packages of marijuana and a backpack with five kilograms of cocaine in G. Roybal's kitchen, see PSR ¶ 26, at 13.  All of these events suggest that G. Roybal was aware of the full scope of the C. Roybal DTO's drug-trafficking operations.  Indeed, unlike the defendant in United States v. Ayers, who was merely a passive observer of the drug-trafficking operations in that case, that G. Roybal kept a large amount of C. Roybal's money at his home and went with C. Roybal to retrieve the money demonstrate that he worked directly with C. Roybal in his drug-trafficking operations.  In addition to these incidents, a search of G. Roybal's residence uncovered six cellular telephones and a digital scale -- all of which suggest that G. Roybal was an integral player in the C. Roybal DTO.  See PSR ¶ 29, at 14.  Accordingly, the Court concludes that a mitigating role adjustment is not warranted in this case.

## VI.   THE BALANCE OF THE 18 U.S.C. § 3553(a) FACTORS WEIGHS AGAINST A DOWNWARD VARIANCE OUTSIDE OF THE GUIDELINES RANGE.

G. Roybal's offense level is 30 and his criminal history category is I, establishing a guideline imprisonment range of 97 to 121 months.  G. Roybal asks the Court to vary downward, however, from the advisory sentencing guideline range in light of the § 3553(a) factors.  In pertinent part, § 3553(a) directs courts to consider

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(**D**) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(**3**) the kinds of sentences available;

(**4**) the kinds of sentence and the sentencing range established for  . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . .

(**5**) any pertinent policy statement . . . issued by the Sentencing Commission . . .

(**6**) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(**7**) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The Court has carefully considered the guidelines and has considered other sentencing goals.  Specifically, the Court has considered the guideline sentencing range established for the applicable category of offense committed by the applicable category of defendant, and the Court believes, after careful consideration of the briefing, the testimony presented at the three sentencing hearings, and the circumstances in this case, that the punishment set forth in the guidelines is appropriate for this offense.  The Court believes that the § 3553(a) factors counsel against a variance in this case, and the Court will therefore deny G. Roybal's request for a variance and will sentence G. Roybal to 97-months imprisonment.

> [I]t  [is]  quite  clear  that  the  sentencing  court  is  not  required  to  consider individually each factor listed in § 3553(a) before issuing a sentence.  Moreover, [the Tenth Circuit] does not demand that the district court recite any magic words to show that it fulfilled its responsibility to be mindful of the factors that Congress has instructed it to consider.

United States v. Rines, 419 F.3d 1104, 1107 (10th Cir. 2005)(quoting United States v. Contreras-Martinez, 409 F.3d 1236, 1242 (10th Cir. 2005)).  The Court will briefly discuss, however, the relevant § 3553(a) factors.

A.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE COUNSEL
      FOR A SENTENCE WITHIN THE GUIDELINES RANGE.

The first § 3553(a) factor requires a sentencing court to consider "the nature and circumstances of the offense."  18 U.S.C. § 3553(a)(1).  Pursuant to the plea agreement, G. Roybal was involved in a conspiracy to distribute cocaine and also tampered with a witness involved in this federal offense.  The Court has also made findings that G. Roybal was involved in storing and distributing cocaine and marijuana for the C. Roybal DTO.  Drug trafficking is serious enough, but G. Roybal's tampering with the witness puts him in a category different from many drug traffickers.  Regardless whether G. Roybal intended to carry out the threat, it can have a chilling effect on the judicial process and the witnesses involved.  The nature and circumstances of the offense thus put upward pressure on the sentence, and keep it within the guidelines range.  The Court, however, generally sentences at the low end of the guidelines range unless there is a particularly aggravating factor.  In this case, there is not a particularly aggravating factor counseling for a sentence at the high end of the guidelines range.  The nature and circumstances of the offense therefore suggest a sentence at the low end of the guidelines range of 97 to 121 months.

B.    G. ROYBAL'S HISTORY AND CHARACTERISTICS COUNSEL FOR A
      SENTENCE BELOW THE GUIDELINES RANGE.

The first § 3553(a) factor also requires the sentencing court to consider "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Given G. Roybal's lack of criminal history and his age, the Court believes that it can use supervised release as a substitute for lengthy incarceration, which counsels for a sentence below the guidelines range.  Further, G. Roybal's family situation puts downward pressure on the sentence.  G. Roybal's parents, particularly his father, and his daughter and grandson are in need of his care and support.  G.

Roybal did some things right in his life and has raised three children who are productive members of society. G. Roybal is going to suffer severe consequences for this felony conviction, including the possibility of losing his nursing career. As previously stated, the Court generally sentences at the low end of the guidelines range unless there is a particularly aggravating factor, and here, there is not a particularly aggravating factor counseling for a sentence at the high end of the guidelines range. Indeed, G. Roybal's history and characteristics, considered alone, counsel for a sentence below the guidelines range. In the end, however, the balance of the 18 U.S.C. § 3553(a) factors suggest only a sentence at the low end of the guidelines range.

> **C.   THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, ADEQUATE DETERRENCE, PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT, THE KINDS OF SENTENCES AVAILABLE AND THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT, ALL COUNSEL FOR A SENTENCE WITHIN THE GUIDELINES RANGE.**

An offense level of 30 and a criminal history category I result in an imprisonment guideline range of 97 to 121 months. If the Court were to vary downward, outside of the guidelines range, however, the sentence would not promote respect for the law. Further, a sentence within the guidelines range is needed to reflect the seriousness of the offense and to provide just punishment, to afford adequate deterrence on the specific and general levels, and to protect the public. As the Court explained above, drug trafficking is a very serious offense. The Albuquerque Journal recently reported that more New Mexicans died of drug overdoses in 2014 than in any other year on record. See Christopher Ingraham, Marijuana is the least of the nation's drug worries, officers say, ALBUQUERQUE JOURNAL, Nov. 6, 2015, at C10. Additionally, witness tampering is a different category of malfeasance. The Court goes to great

lengths to protect the judicial system and the rule of law.  When there are threats to injure a confidential informant after a case is started, that conduct goes to the very heart of the judicial process.  The seriousness of the offense thus puts upward pressure on the sentence and keeps it within the guidelines range.

The Court fears that a sentence below the guidelines range would also not promote respect for the law.  Further, a sentence within the guidelines range is needed to provide just punishment and afford adequate deterrence -- particularly as to witness tampering.  The need for the sentence to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, also puts upward pressure on the sentence and keeps it within the guidelines range.  That Issac Gonzales and Cesar Ramirez, who were more involved in C. Roybal's DTO than G. Roybal, received lower sentences puts some downward pressure on the sentence.  That downward pressure, however, is mitigated by the fact that those sentences resulted from problems with the United States' cases against them.  Here, by contrast, the United States' case against G. Roybal is very strong, and they could likely get a conviction for what they have alleged here.  This strong evidence puts upward pressure on the sentence.  G. Roybal's request for a 37-month sentence is too low, from a number of standpoints, including in comparison with other defendants that have been sentenced for their role in C. Roybal's DTO.  In sum, the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, adequate deterrence, protect the public from further crimes committed by G. Roybal, the kinds of sentences available and the need to avoid unwarranted sentence disparities among defendants, suggest a sentence at the low end of the guidelines range.

### D.     IN SUM, THE 18 U.S.C. § 3553(a) FACTORS PUT UPWARD PRESSURE ON THE SENTENCE AND WEIGH AGAINST A DOWNWARD VARIANCE OUTSIDE OF THE GUIDELINES RANGE.

In sum, the Court has identified about ten factors that put downward pressure on the sentence: (i) the Court can use supervised release rather than incarceration to address some of G. Roybal's problems; (ii) the Court always needs to craft a sentence that is no greater than necessary to achieve the § 3553(a) goals and to reflect the factors in § 3553(a); (iii) as discussed above, G. Roybal's family: he takes care of his family, parents, grandson, and daughter; (iv) G. Roybal is going to lose the use of firearms, which has been a big part of his life; (v) he will now be a felon, which carries certain hardships; (vi) he may lose his career; (vii) the United States did not think that the Court would apply an enhancement under § 2D1.1(b)(12), and was prepared to advocate for a sentence at the high end of the lower guidelines range of 78 to 97 months; (viii) Isaac Gonzales and Cesar Ramirez are more involved in the C. Roybal DTO, but will be receiving less time in incarceration; (ix) G. Roybal seems to be closest to Cesar Ramirez, who got 54 months; and (x) the United States seems to be content with a sentence of 78 months, which is 6 and one-half years.

On the other hand, the Court identifies about fifteen factors that put upward pressure on the sentence and counsel for a guideline sentence: (i) the seriousness of this offense: drugs and tampering with a witness; this case goes to the heart of the criminal justice system because it involves the threatening of a confidential informant; (ii) the sentence must promote respect for the law; (iii) the sentence must provide a just punishment; (iv) the sentence must afford adequate deterrence, both at a specific and general level; (v) the sentence must protect the public; (vi) the need to avoid unwarranted sentencing disparity generally puts pressure on the sentence to stay within the guidelines; (vii) the sentence must, in the end, be reasonable; (viii) the sentence must

be sufficient to reflect the § 3553(a) factors; (ix) unlike with some defendants, there are no problems with the government's case against G. Roybal; (x) the Court does not think G. Roybal was candid at the evidentiary sentencing hearing and has concerns about his candor because his testimony at times was not consistent with what the Court could see, in wiretap and other materials, and hear with its own eyes and ears; he talked in code in the intercepted telephone calls, and it was clear, that despite his attempts to minimize his role, he was very involved; (xi) G. Roybal was not candid with the Court in his testimony on June 1, 2015; and (xii) his proposed sentence of 37 months would be too low, because it would not reflect the severity of the offense, especially the witness tampering.  C. Roybal -- not G. Roybal -- will receive the highest sentence of 14 years.  G. Roybal is receiving just a little over 8 years.  G. Roybal is not receiving the highest sentence, and he should not be, but he should not receive only 37 months.  G. Roybal has made a persuasive case why his sentence should not be like C. Roybal's.  The Court carefully compared the sentences it has given others: (i) Brandy Lucero: 5 years' probation; (ii) Kristen Lucero: 5 years' probation; and (iii) Tianna Candelaria: 5 years' probation.  The women, however, are not comparable to G. Roybal.  Kenneth Ulibarri got 6 months, but he is not the best comparison.  Jairus Granado got 12 months and one day, and Paul Ulibarri got 21 months, but they are not as good a comparison as Manuel Valencia, who got 37 months, and Cesar Ramirez, who got 54 months.  The issue is that there were problems with the United States' case against Valencia and Ramirez.  In the end, the Court is convinced that a sentence at the low end of G. Roybal's guidelines range, without any variance, is the appropriate sentence, because the factors that put upward pressure on his sentencing outweigh those that put downward pressure and a 97-month sentence is in line with the sentence the Court has given other defendants in this case.

While the Court's task, as a district court, is not to arrive at a reasonable sentence -- it is

to come up with one that reflects the factors in 18 U.S.C. § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section § 3553(a)(2).")(citation omitted) -- the Court believes this sentence is reasonable and more so than one below the sentencing guidelines range.  In sum, the Court believes that a sentence of 97 months is sufficient without being greater than necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987.

**IT IS ORDERED** that Defendant George Roybal's objection to the PSR's application of a 2-level enhancement under § 2D1.1(b)(1) is sustained and G. Roybal's four other objections are overruled.  G. Roybal's request for a downward variance is also denied.  The Court sentences Defendant George Roybal to 97-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
    United States Attorney
Joel R. Myers
Cynthia Weisman
Stephen R. Kotz
Shana Long
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Samuel L. Winder
Walz & Associates
Albuquerque, New Mexico

        *Attorney for the Defendant*

- 86 -